822 F.2d 1089
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Herbert THOMAS, Plaintiff-Appellee, Cross-Appellant,
v.
NORBAR, INC., Hartco, Inc., and David Hartman,
Defendants-Appellants, Cross-Appellees.
 Nos. 86-3413, 86-3439
 United States Court of Appeals, Sixth Circuit.
 July 14, 1987.
 
 KENNEDY and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants Norbar, Inc., Hartco, Inc., and David Hartman appeal from the judgment in favor of plaintiff on his claims of retaliatory discharge and racial discrimination under Title VII and 42 U.S.C. Sec. 1981. Plaintiff cross-appeals from the magistrate's ruling on the issue of damages. For the reasons that follow, we reverse.
 
 I.
 
 2
 Defendant Norbar, Inc., is a corporation engaged in the trucking business. Its single client is the United States Postal Service, for which it transports mail. At the times relevant to the present dispute, Norbar had contracts to transport mail between Cincinnati, Ohio, and Greensboro, North Carolina, and between Cincinnati and Dallas, Texas.
 
 
 3
 Plaintiff was employed by Norbar as an 'extra board' driver from October 1980 until March 1981. Because the Post Office occasionally adds extra runs without notice, and because it demands punctuality on scheduled runs, extra drivers must be available on short notice. To comply with these requirements, extra board drivers are hired for the purpose of driving unscheduled runs and filling in for drivers who are unable to make scheduled runs.
 
 
 4
 The Drivers' Manual provided to all Norbar employees imposes the following requirements for extra board drivers:
 
 
 5
 All new drivers at start will be placed on the extra board and be under 90 days probation. The extra board drivers are required to call in every day and generally make themselves available to go out with 4 hours notice. Any driver who fails to call in for two consecutive days will be dropped to the bottom of the seniority list for extra drivers. This means that it could take a very long time to build up enough seniority to become a regular scheduled driver. Any driver who does not call in for four days shall be considered to have quit.
 
 
 6
 Joint Appendix at 79.
 
 
 7
 The parties dispute the manner in which extra board drivers learn of their driving assignments. Ronnie Vaughn, defendant's terminal manager, indicated that an extra board driver's name is never placed on the schedule unless he speaks with the driver on the telephone to confirm the driver's availability. He testified that it was 'impossible' that an extra board driver's name would be placed on the schedule without calling him first. Joint Appendix at 240-42. Plaintiff testified that he did not always learn of his assignments over the phone. Rather, he often came into the terminal and looked at the board to see whether he was scheduled. Joint Appendix at 172.
 
 
 8
 On February 25, 1981, plaintiff went to the terminal to look at the schedule. He testified that he was scheduled to work that night. On the same day, Margaret McCullom, a commissioner from the Ohio Civil Rights Commission (OCRC) visited the plant in connection with her investigation of several charges pending against Norbar. While McCullom was present at the facility, she spoke with plaintiff regarding the treatment of minority employees at Norbar.[1]
 
 
 9
 McCullom testified that plaintiff was reluctant to speak with her.
 
 
 10
 When he [plaintiff] entered the office he didn't want to talk to me. He said, 'Oh, I know I'm going to be fired. I know I'm going to be fired.' And I asked him why would he say that. He said, 'Because they want me to tell you everything is all right in this company but it's not and I would be telling a lie.' So I explained to him that they would not know what he said, the information that he gave would be confidential until if a probable cause was found [sic] that he may be called to testify at a public hearing and that's when they would become aware of the testimony that he had given.
 
 
 11
 Joint Appendix at 151. At the end of the conversation, plaintiff asked for McCullom's card '[b]ecause . . . he knew he was going to have to call [her] later.' Id.
 
 
 12
 Plaintiff's testimony is not entirely consistent with McCullom's. He testified that Harmon insisted that he speak with McCullom, despite his reluctance to do so. However, plaintiff did not testify that he was pressured into telling McCullom a lie.
 
 
 13
 Q. How did you and she happen to speak?
 
 
 14
 A. Well I had come in to check the board, the extra board, the board with the driver's schedule on them. I had come in, Lloyd Harmon came out and said, 'There's someone I would like for you to talk to', and I said, 'Well, what is it about', he said, 'Well, she's a Civil Rights Commissioner and wants you to talk to her about the company', and I said, 'I have nothing to say about the company. I don't want to talk to her'. He said, 'Well, I want you to go talk to her'. I said, 'I have nothing to talk about. What happened before I came here I cannot talk about.' He said, 'Well, I want you to go and talk to her.' So he more or less led me in to speak with her.
 
 
 15
 .............................................................
 
 
 16
 ...................
 
 
 17
 * * *
 
 
 18
 Q. What did you say to her at that time?
 
 
 19
 A. When I first walked in I told her I just lost my job. I said, 'Lady, you got me fired.' She said, 'why do you say that?' I said, 'Well, because I didn't really want to talk to you because I have nothing to talk about. The things that happened before I got here.' She said, 'Well, I want you to talk about what happened since you've been here.' I said--well then I proceeded to tell her some things that I found fault with.
 
 
 20
 Joint Appendix at 174-75. Harmon denied that plaintiff expressed any reluctance to speak with McCullom. Joint Appendix at 226-27.
 
 
 21
 Plaintiff testified that, after he spoke with McCullom, his name was removed from the driving schedule for three consecutive days, February 25-27, 1981. Plaintiff did not have a run scheduled on March 2, 3 or 4. On Wednesday, March 4, 1981, Vaughn allegedly told plaintiff to stop calling in because Vaughn would call him when he needed him. Joint Appendix at 180. Vaughn denied making such a statement. On March 10, 1981, when he went to the terminal to pick up his paycheck, plaintiff learned that his employment had been terminated because he had failed to call in for more than four days.
 
 
 22
 Plaintiff filed charges with the OCRC, which issued a no probable cause determination. The EEOC issued a right to sue letter bearing the date of January 7, 1982.[2] Plaintiff filed suit on March 29, 1983.
 
 
 23
 The case was heard by a magistrate on April 2, 1985. The magistrate, by consent of the parties pursuant to 28 U.S.C. Sec. 636(c)(1), entered final judgment on the issue of liability on September 5, 1985. He found that plaintiff had been discharged in retaliation for his reluctance to assist his employer in the investigation of charges pending at the time of McCullom's visit. As an alternative ground for his decision, he concluded that plaintiff's race was a factor in defendant's decision to terminate plaintiff following his discussion with Margaret McCullom and his expression of unwillingness to meet with Margaret McCullom.
 
 
 24
 The magistrate also concluded that Norbar and Hartco were so closely related that they constituted a single entity for purposes of liability under Title VII. Accordingly, he concluded that Hartco was jointly and severally liable for the damages suffered by plaintiff. In addition, he held David Hartman, the sole stockholder of both entities, liable on the ground that the corporate entities were his alter ego.
 
 
 25
 On January 7, 1986, a separate hearing was conducted to consider the issue of damages. The magistrate awarded back pay and attorney's fees, but declined to award front pay or reinstatement on the ground that plaintiff had become disabled.
 
 II.
 A.
 
 26
 As an initial matter, defendants object to the fact that the magistrate engaged in a wholesale adoption of plaintiff's proposed findings of fact and conclusions of law. This practice is disfavored. See, e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 572 (1985); Falcon Construction Co. v. Economy Forms Corp., 805 F.2d 1229, 1232 (5th Cir. 1986); McDowell v. Safeway Stores, Inc., 753 F.2d 716, 717 (8th Cir. 1985); Lewis v. NLRB, 750 F.2d 1266, 1272 n.5 (5th Cir. 1985).
 
 
 27
 Important evidence is more likely to be overlooked or inadequately considered when factual findings are not the product of personal analysis and interpretation by the trial judge. . . . We [express] our strong disapproval of this practice. Nevertheless, such findings are formally the district court's and we proceed, therefore to examine the record for support of these findings.
 
 
 28
 Jones v. International Paper Co., 720 F.2d 496, 499 (8th Cir. 1983). Although we agree that a trial judge is well-advised to take a more active role in the drafting of factual findings, we recognize that findings proposed by a litigant and adopted by the court are entitled to deference under Rule 52(a) of the Federal Rules of Civil Procedure. Anderson, 470 U.S. at 572.
 
 
 29
 The magistrate's conclusion that plaintiff's discharge was the product of unlawful retaliation is reviewed under the clearly erroneous standard. See, e.g., Wrenn v. Gould, 808 F.2d 493, 499 (6th Cir. 1987); Davis v. Lambert of Arkansas, Inc., 781 F.2d 658, 660 (8th Cir. 1986); Unt v. Aerospace Corp., 765 F.2d 1440, 1444 (9th Cir. 1985); McKenna v. Weinberger, 729 F.2d 783, 790 (D. C. Cir. 1984); McMillan v. Rust College, Inc., 710 F.2d 1112, 1116 (5th Cir. 1983). The same standard is utilized to evaluate the finding of racial discrimination. See Anderson, 470 U.S. at 573; Lewis, 750 F.2d at 1266.
 
 
 30
 "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S. at 573 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). Although factual findings based upon credibility determinations are entitled to special deference,
 
 
 31
 [t]his is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.
 
 
 32
 Anderson, 470 U.S. at 575. 'Concededly, it is the rare case that should be reversed under this very restricted scope of review, but we are obliged to conclude that the judgment here meets that test.' Bishopp v. District of Columbia, 788 F.2d 781, 786 (D.C. Cir. 1986).
 
 
 33
 The analysis of retaliation cases is governed by the framework provided by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[3] Initially, plaintiff must establish a prima facie case. Once a prima facie case has been established, the defendant must articulate a legitimate, nondiscriminatory reason for the discharge. If it does so, plaintiff must establish that the proffered reasons are pretextual. See Wrenn, 808 F.2d at 500-01; Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., 783 F.2d 50, 54 (6th Cir.), cert. denied, 106 S. Ct. 3298 (1986); Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985); see also Mays v. Williamson & Sons Janitorial Services, Inc., 775 F.2d 258, 259 (8th Cir. 1985); Klein v. Trustees of Indiana University, 766 F.2d 275, 280 (7th Cir. 1985).
 
 
 34
 To establish a prima facie case of retaliatory discharge, plaintiff must prove by a preponderance of the evidence:
 
 
 35
 (1) that he engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding;
 
 
 36
 (2) that he was subject to adverse employment action subsequent to or contemporaneous with his protected activity;
 
 
 37
 (3) there is a causal connection between the protected activity and the adverse employment action.
 
 
 38
 Jackson, 783 F.2d at 54; see Cooper v. City of North Olmstead, 795 F.2d 1265 (6th Cir. 1986).[4]
 
 
 39
 Initially, the magistrate concluded that plaintiff was discharged in retaliation for the substance of the statements he made to McCullom. There is no support in the record for this finding. Although Harmon deposed that McCollum told him plaintiff was happy in his job, McCollum denied making such a statement and Harmon repudiated it at the trial. Moreover, the finding is not supported by the fact that McCollum refused to confirm or deny Harmon's speculation that plaintiff must have told her there was an absence of racial discrimination at Norbar. This conversation did not occur until March 10, 1981--six days after the date upon which plaintiff was discharged. Moreover, McCullom's testimony regarding this conversation is inconsistent with her deposition, given on September 11, 1984, in which she stated that she could not remember whether she spoke with Harmon regarding the substance of her conversation with plaintiff. Joint Appendix at 154.
 
 
 40
 The magistrate also concluded that plaintiff was discharged in retaliation for his reluctance to speak with McCollum. As an initial matter, we must consider whether this activity is protected by Title VII.
 
 
 41
 This court has recently considered whether non-participation in an investigation is protected by the ADEA, which contains an antiretaliation provision similar to the one contained in Title VII.[5] In Merkel v. Scovill, Inc., 787 F.2d 174 (6th Cir.), cert. denied, 107 S. Ct. 585 (1986), plaintiff argued that his discharge, based at least in part upon his refusal to sign an affidavit prepared in the course of an investigation of discrimination, violated the ADEA. We noted that the ADEA, like Title VII, protects participation in the investigative process.
 
 
 42
 Thus, at least arguably and as [defendant] contends, discrimination against an employee for lack of participation or nonparticipation in an investigation would not be a violation of the ADEA. This may be true as a general proposition. However, we believe, in view of the remedial purpose of the ADEA, that there may well be exceptions to this proposition. For example, if an employer, in the course of an investigation, seeks a statement from an employee that the employer knows or should know to be false, or the employer does not reasonably believe that the employee has the sought-for information, and the employee refuses, discrimination or retaliation against the employee for such nonparticipation may well be a violation of the ADEA. However, here there was no evidence . . . that [defendant] knew or should have known that the affidavit was false, even if it was, and there was no evidence that [defendant] did not reasonably believe that Merkel had the sought-for information; all the evidence is to the contrary. Moreover, [defendant] had been directed by the OCRC to obtain an affidavit from Merkel. It is in the interest of all concerned and consistent with the purpose of the ADEA to investigate and to resolve a discrimination charge as expeditiously and as fairly as reasonably possible. Thus it appears to us that the ADEA should not be construed to hold an employer liable for retaliation against an employee under the circumstances presented here.
 
 
 43
 Id. at 179-80.
 
 
 44
 Merkel clearly establishes that the refusal to participate in an investigation of discrimination is not always a protected activity. Under these circumstances, the plaintiff is entitled to the protection of the antiretaliation provision only if the record supports a finding that the defendant pressured plaintiff to give a false statement or to provide evidence he did not possess.
 
 
 45
 The record in the present case does not support such a finding. Plaintiff's own testimony indicates that Harmon did nothing more than insist that plaintiff speak with McCullom. Plaintiff did not testify that Harmon pressured him to lie, nor did he state that Harmon insisted that he give information regarding matters about which he had no knowledge. In fact, plaintiff himself testified that McCullom only requested information regarding 'what happened since [plaintiff had] been here.' Joint Appendix at 175.
 
 
 46
 The only evidence substantiating plaintiff's claim is the testimony of Margaret McCullom. Yet McCullom's recollection of plaintiff's statements regarding his reluctance to participate in the investigation are not fully corroborated by the very person who supposedly made them. Under these circumstances, viewing the record as a whole, we are 'left with the definite and firm conviction that a mistake has been committed.' Anderson, 470 U.S. at 573. Because we conclude that the facts of the present case do not support an inference that plaintiff was pressured to provide false information, he is not entitled to the protection of the antiretaliation provision. Accordingly, the judgment of the district court on the issue of retaliation is reversed.
 
 B.
 
 47
 The magistrate's conclusion that plaintiff was subjected to disparate treatment on the basis of race also cannot be supported by this record. This court has recently considered the elements necessary to support a prima facie case of racial discrimination in the discharge setting.
 
 
 48
 'The three elements necessary to establish a prima facie case of discriminatory discharge were specifically enumerated by this court in Potter v. Goodwill Industries, 518 F.2d 864 (6th Cir. 1975). A plaintiff must show ' that he is a member of a class entitled to the protection of the Civil Rights Act, that he was discharged without valid cause, and that the employer continued to solicit applications for the vacant position.' Id. at 865. Failure to prove any of these elements by a preponderance of the evidences mandates a dismissal of the plaintiff's suit.'
 
 
 49
 Shah v. General Electric Co., 816 F.2d 264, 268 (6th Cir. 1987) (quoting Morvay v. Maghielse Tool & Die Co., 708 F.2d 229, 233 (6th Cir.), cert. denied, 464 U.S. 1011 (1983)).
 
 
 50
 Once a prima facie case has been established, the defendant must articulate a legitimate, nondiscriminatory reason for the employment termination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). 'The burden of articulating a legitimate, nondiscriminatory reason for the adverse action does not require the defendant to prove the absence of a discriminatory motive in order to rebut the plaintiff's prima facie case.' Daniels v. Board of Education, 805 F.2d 203, 207 (6th Cir. 1986). "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id. (quoting Burdine, 450 U.S. at 255). If the defendant satisfies this intermediate burden, plaintiff must prove that the proffered reasons are a pretext. Id.
 
 
 51
 When a Title VII plaintiff's claims of racial discrimination have been fully tried, and the defendant has articulated a legitimate, nondiscriminatory basis for the termination decision, an appellate court need not consider whether the plaintiff has established a prima facie case.
 
 
 52
 Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'
 
 
 53
 United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715 (1983) (quoting Burdine, 450 U.S. at 253); see also Daniels, 805 F.2d at 208, Goostree v. Tennessee, 796 F.2d 854, 861 (6th Cir. 1986), cert. denied, 107 S. Ct. 1374 (1987).
 
 
 54
 In the present case, defendant presented evidence indicating that it fired plaintiff because he failed to call in for more than four days. Given the stringent standards imposed by the postal service and the company's dependence upon the availability of extra board drivers, we conclude that the intermediate burden has been satisfied. Thus, we must review the ultimate holding in this case; i.e., whether plaintiff was a victim of intentional racial discrimination.
 
 
 55
 The essence of a disparate treatment claim is that similarly situated individuals were accorded different treatment on the basis of race.[6] B. Schlei & P. Grossman, Employment Discrimination Law at 13 (2d ed. 1983); Daniels, 805 F.2d at 206. In the present case, plaintiff has failed to establish that similarly situated white employees were treated differently. In fact, the parties stipulated that white extra board drivers who failed to call in for more than four days were discharged. Under these circumstances, the magistrate's finding that plaintiff was a victim of racial discrimination cannot be upheld.
 
 
 56
 Our resolution of the issues discussed above renders it unnecessary for us to consider the procedural and evidentiary matters raised by the defendants. Moreover, our reversal on the issue of liability pretermits our consideration of the damage issues presented in plaintiff's cross-appeal.
 
 III.
 
 57
 Accordingly, for the reasons stated, the judgment of the magistrate is REVERSED, and the plaintiff's action is DISMISSED.
 
 
 
 [1]
 There is a dispute as to the manner in which this conversation was initiated. Lloyd Harmon, Vice-President and General Manager of Hartco, testified that McCullom requested an opportunity to speak with a minority employee. Harmon's testimony was corroborated by the testimony of Ronnie Vaughn, defendant's terminal manager. McCullom, on the other hand, testified that Harmon suggested that she interview a minority employee
 
 
 [2]
 The magistrate concluded that the letter was issued on January 7, 1983, and was erroneously dated. This conclusion is supported by the fact that OCRC did not complete its investigation until December 1982. We hold that the magistrate's resolution of this factual dispute is not clearly erroneous
 
 
 [3]
 Plaintiff's claims are based on Title VII, 42 U.S.C. Sec. 2000e, and 42 U.S.C. Sec. 1981. The method of analysis for both claims is the same. See, e.g., Daniels v. Board of Education, 805 F.2d 203, 207 (6th Cir. 1986); Goff v. Continental Oil Co., 678 F.2d 593, 595 (5th Cir. 1982); see generally Winston v. Lear-Siegler, Inc., 558 F.2d 1266 (6th Cir. 1977) (42 U.S.C. Sec. 1981 provides cause of action for retaliatory discharge)
 
 
 [4]
 At least one panel of this court has enumerated knowledge of plaintiff's protected activity as a separate element of the prima facie case. Wrenn, 808 F.2d at 500. This difference in formulation is not significant; it is implausible that a plaintiff could establish a causal connection between the exercise of a protected right and the adverse personnel decision if his employer did not possess some information indicating that a right had been exercised. See Cohen v. Fred Meyer, Inc., 686 F.2d 793 (9th Cir. 1982)
 
 
 [5]
 42 U.S.C. Sec. 2000e-3(a) provides in relevant part:
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 Thus, in order for plaintiff to claim the protection of section 2000e-3, he must establish that he participated in an investigation, proceeding or hearing, or that he opposed an unlawful practice.
 
 
 [6]
 Plaintiff argues, and the magistrate held, that he was treated differently from white employees because 'no whites were asked to speak with the O.C.R.C. investigator and, consequently, none were in danger of displeasing Mr. Harmon . . . and losing their job.' Brief at 17. However, we conclude that the magistrate's finding is clearly erroneous. McCullom testified that she did interview other employees in connection with her investigation. Joint Appendix at 153-54. The record is devoid of any reference to the race of those employees or the consequences, if any, of their participation or of any refusal or reluctance to participate in the investigation