[Cite as *Croley v. JDM Servs., L.L.C.*, 2025-Ohio-4762.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Jhalil Croley, | : | |
| Plaintiff-Appellant, | : | No. 23AP-544 |
| | | (C.P.C. No. 20CV-6746) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| JDM Services, LLC, d.b.a. Frank Road Recycling Solutions et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on October 16, 2025

**On brief:** *Walton + Brown, LLP, Sean L. Walton*, and *Chanda L. Brown*, for appellant.
**Argued:** *Chanda L. Brown.*

**On brief:** *Amundsen Davis, Natalie P. Bryans, Steven E. Miller*, and *Christopher R. Green*, for appellees.
**Argued:** *Steven E. Miller.*

APPEAL from Franklin County Court of Common Pleas

MENTEL, J.

## I. INTRODUCTION

{¶ 1} Plaintiff-appellant, Jhalil Croley, appeals from an August 10, 2023 decision and entry granting the motion for summary judgment of defendants-appellees, JDM Services, LLC, d.b.a. Frank Road Recycling Solutions ("Frank Road Recycling"), and Joseph Loewendick. For the reasons that follow, we reverse.

## II. FACTS AND PROCEDURAL HISTORY

{¶ 2} Croley, an African American male, is a certified heavy equipment operator. Croley received his certification from Performance Training Solution in 2019. (Croley Dep. at 8-9, 20; Compl. at ¶ 2; Answer at ¶ 2.) In January 2020, Croley filed a job application

through Reliable Staffing, a temporary employment agency, as a heavy equipment operator at Frank Road Recycling. (Croley Dep. at 15-17.) On January 10, 2020, Ken Pennington, the general manager of Frank Road Recycling, interviewed Croley regarding the position. (Croley Dep. at 17-20; Loewendick Dep. at 5-7.) During the interview, Croley was asked to demonstrate that he could operate the equipment. Croley successfully operated an excavator for approximately one hour and was offered the job. (Croley Dep. at 19-20.) Croley accepted the job, completed a drug screen, and left for the day. (Croley Dep. at 22-24.)

{¶ 3} On January 13, 2020, Croley reported to Frank Road Recycling for his first day of work. (Croley Dep. at 26.) Croley and other employees were driven by pickup truck to the landfill. (Croley Dep. at 28-30, 33.) Croley operated an excavator for eight hours without incident. (Croley Dep. at 33.)

{¶ 4} On January 14, 2020, Croley clocked in at 8:15 a.m. and went with the other employees by pickup truck to work in the landfill. (Croley Dep. at 34.) Pennington, traveling in the opposite direction, pulled alongside the pickup truck and instructed the driver to "[m]ake sure the new operator, Jhalil, gets on the compactor." (Croley Dep. at 34.) Upon arrival at the landfill, Austin Moore, assistant manager, directed a compactor operator, Alex Covix, to give Croley instructions on how to check fluids as well as provide a general rundown of the machine. (Croley Dep. at 34-35; Loewendick Dep. at 7.) After training with Covix, Moore drove Croley across the landfill in the compactor to provide him some additional instruction on how to operate the machine. (Croley Dep. at 34-36.) Croley, finding the ride was becoming bumpy, searched for something to hold onto for stability. (Croley Dep. at 35, 40.) When Croley grabbed a rope that was hung on his left side, he found the rope was not stable nearly causing him to fall from the compactor. (Croley Dep. at 35; 117.) According to Croley, he was focused on the machine and did not pay attention to the rope or think anything about it at the time. (Croley Dep. at 35, 39.)

{¶ 5} After some additional instruction, Moore left Croley to operate the compactor. (Croley Dep. at 35.) According to Croley, he noticed that the rope was wrapped around the rearview mirror. (Croley Dep. at 117.) After a few minutes, Croley observed that the rope was tied like a noose, which caused him to become "nervous and scared." (Croley Dep. at 35-36, 64.) Croley took a picture of the noose noting that it had no dirt and was

"freshly-tied." (Croley Dep. at 46.) Croley left the noose in the compactor and ate lunch alone in his vehicle. (Croley Dep. at 48, 50.) At the end of the day, Croley took the noose from the compactor and left it outside the door of the employee trailer. (Croley Dep. at 50-52.) Croley cried in his car before proceeding home for the day. (Croley Dep. at 53.)

{¶ 6} That night, Croley contacted his career advisor at Jewish Family Services for Family Forward, Fred Points, to report finding the noose. (Croley Dep. at 55-56, 59-60.) Upon Points' suggestion, Croley sent an image of the noose to an employee at Reliable Staffing on the morning of January 15, 2020. (Croley Dep. at 55, 60-62.) The employee at Reliable Staffing indicated that they would contact Pennington regarding the incident. (Croley Dep. at 60-61.)

{¶ 7} Croley reported for work on January 15, 2020. Within 15 minutes of his arrival, Pennington told Croley that he would investigate the matter and figure out who hung the noose in the compactor. (Croley Dep. at 63-64.) When Pennington asked where the noose was located, Croley stated that it was left outside the employee trailer. (Croley Dep. at 65.) After his lunch break, Croley noticed the noose was still outside the trailer. Croley spoke with Points again, who advised him to pick up the rope and preserve it in case he had to give it to a lawyer to investigate the incident. (Croley Dep. at 79.) Croley picked up the noose and put it in his vehicle. (Croley Dep. at 68-69.) At the end of the shift, Pennington asked if he could see the noose. (Croley Dep. at 72-73.) Croley retrieved the noose from his vehicle and provided it to Pennington. When Pennington asked to keep the noose, Croley refused. (Croley Dep. at 72-73.) Croley explained that he did not trust anyone. (Croley Dep. at 73.) Croley testified that he was "never comfortable" again at work after the noose incident. (Croley Dep. at 98.)

{¶ 8} On January 20, 2020, Croley was assigned to operate an excavator picking up scrap metal on the side of a "cliff" in the landfill. (Croley Dep. at 83, 105.) On January 21, 2020, Croley was assigned to operate the excavator in an open area of the landfill while another employee went to lunch. (Croley Dep. at 83-85.) According to Croley, the glass on the cab of the excavator shattered while he was operating the machine. (Croley Dep. at 81.) Croley believed that the reason the glass shattered was "[j]ust as intentional as the noose." (Croley Dep. at 99.) Croley alleged the glass shattered from a BB or pellet gun. (Croley Dep. at 81-82, 86, 90-91.) Croley explained that before the excavator was parked, "the glass

was still intact, it was just a small hole, but the whole glass was shattered." (Croley Dep. at 89.) Immediately after the incident, Croley noticed that Pennington's truck was parked at the top of a hill. (Croley Dep. at 81-82.) Croley cleaned up the broken glass and worked for the rest of the day driving a rock truck. (Croley Dep. at 82, 90-91.)

{¶ 9} On January 22, 2020, Croley was instructed not to come into work. (Croley Dep. at 76-77, 91-92.) A meeting was later scheduled between Croley and Loewendick, a co-owner of Frank Road Recycling, for the following day. (Croley Dep. at 92; Loewendick Dep. at 5-6.) On January 23, 2020, Croley worked on an excavator from 8:15 to 9:28 a.m. (Croley Dep. at 93.) Croley then met with Loewendick, Pennington, Steven Miller, and Theresa Keller from Reliable Staffing. (Croley Dep. at 93; Loewendick Dep. at 14-15.) Croley was informed that Frank Road Recycling would not tolerate any racial discrimination, and that they were investigating the incident. (Croley Dep. at 94; Loewendick Dep. at 16.) Loewendick requested that Croley bring the noose to work the next day, to which Croley agreed. (Croley Dep. at 94; Loewendick Dep. at 17.) Croley returned to work for the remainder of the day. (Croley Dep. at 97-98.)

{¶ 10} On January 24, 2020, Croley reported for work. During his shift, Croley was reprimanded for allegedly operating the compactor in a higher gear. (Croley Dep. at 119.) Croley disputed the basis for the reprimand and was not aware of any written disciplinary report at the time. (Croley Dep. at 118-119.) While Croley operated the compactor, Loewendick approached and asked if he had brought the rope. (Croley Dep. at 94-95; Loewendick Dep. at 17-18.) Croley stated that the noose was in his vehicle. (Croley Dep. at 94-95; Loewendick Dep. at 17-18.) Moore then drove Croley back to his vehicle to retrieve the noose. (Croley Dep. at 95.) Croley allowed Loewendick to see the noose but refused to turn it over to Frank Road Recycling. (Croley Dep. at 95; Loewendick Dep. at 18.) Loewendick then offered to cut a piece off the end of the rope to compare it with other rope on the premises to identify where it came from, but Croley refused. (Croley Dep. at 95-96; Loewendick Dep. at 18.) According to Loewendick, Croley stated, "I'm not giving it to you, I don't trust you." (Loewendick Dep. at 18.) Loewendick acknowledged that he did not offer to store the noose in a "safe" location where "everyone could feel comfortable." (Loewendick at 23.) As a result, Loewendick terminated Croley for insubordination and impeding the investigation into the noose incident. (Croley Dep. at 95-96; Loewendick

Dep. at 18-19.) Loewendick recalled that Croley was not disrespectful and did not threaten him as he left. (Loewendick Dep. at 19.)

{¶ 11} After terminating Croley, Loewendick called the Columbus Police Department to file a criminal charge against Croley for allegedly making threatening statements to another employee. (Loewendick Dep. at 27-28.) However, Loewendick admitted that the employee told the police that he never felt threatened at Frank Road Recycling. (Loewendick Dep. at 29.) Law enforcement took no legal action based on Loewendick's complaint. (Loewendick Dep. at 31.) According to Loewendick, he called the police because "[i]t was [his] duty to keep a safe workplace." (Loewendick Dep. at 30.) Loewendick conceded that he never called the police regarding the noose incident because they were "doing an investigation." (Loewendick Dep. at 30.)

{¶ 12} On October 14, 2020, Croley initiated this action against Frank Road Recycling and Loewendick raising the following causes of action: hostile work environment (Count One); race discrimination (Count Two); and retaliation (Count Three). The appellees filed an answer on November 19, 2020. On January 18, 2022, the appellees filed a motion for summary judgment as to all three claims. On March 1, 2022, Croley filed a memorandum in opposition arguing there was a genuine issue of material fact regarding the hostile work environment and retaliation causes of action. A reply brief was filed on March 14, 2022.

{¶ 13} On August 10, 2023, the trial court issued a written decision granting the appellees' motion for summary judgment. Specifically, the trial court concluded that the alleged acts were not severe or pervasive enough to create a hostile work environment. The trial court next found that there was no genuine issue of material fact as to the race discrimination claim. The trial court explained that even if Croley could demonstrate a prima facie case of race discrimination, the appellees satisfied their burden by offering legitimate, nondiscriminatory reasons for termination based on Croley's purported misconduct, insubordination, and interference with the investigation into the alleged conduct. Finally, the trial court found that Croley could not succeed in his retaliation claim as termination based on his refusal to turn over the noose to the appellees, or allow them to cut a piece of it for use in the investigation, was not protected activity.

{¶ 14} Croley filed a timely appeal.

## III. ASSIGNMENT OF ERROR

{¶ 15} Croley assigns the following as trial court error:

> The trial court erred when it granted the motion for summary judgment filed by Frank Road Recycling.

## IV. STANDARD OF REVIEW

{¶ 16} Pursuant to Civ.R. 56(C), the party moving for summary judgment bears the initial burden of demonstrating for the trial court the grounds for the motion and identifying those portions of the record showing the absence of a genuine issue of material fact. *Donaldson v. Ohio Dept. of Rehab. & Corr.*, 2024-Ohio-6110, ¶ 15 (10th Dist.), citing *Price v. Evans Auto Repair, Inc.*, 2024-Ohio-5108, ¶ 12 (10th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). "However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the non-moving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the non-moving party has no evidence to support the non-moving party's claims." (Citation omitted.) *Meredith v. ARC Indus., Inc. of Franklin Cty.*, 2024-Ohio-4466, ¶ 20 (10th Dist.). If the moving party fails to satisfy its initial burden, the trial court must deny the motion for summary judgment. *Price* at ¶ 12. If the moving party has met its initial burden under Civ.R. 56(C), then the nonmoving party has a reciprocal burden to respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Commonwealth Cas. Ins. Co. v. Small*, 2025-Ohio-184, ¶ 13 (10th Dist.). In the summary judgment context, a "material" fact is one that could affect the outcome of the case under the applicable substantive law. *Plough v. Nationwide Children's Hosp.*, 2024-Ohio-5620, ¶ 30, citing *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993). A genuine dispute of fact exists if the evidence presents sufficient disagreement between the parties' positions. *Id.*

{¶ 17} Summary judgment is appropriate when the moving party demonstrates "(1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Small* at ¶ 12, citing Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). "Because summary judgment is a procedural device used to

terminate litigation, it must be awarded with caution." *Id.* at ¶ 13, citing *Davis v. Loopco Industries, Inc.*, 66 Ohio St.3d 64, 66 (1993), citing *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-59 (1992). When considering a motion for summary judgment, a reviewing court must resolve all doubts and construe the evidence in a light most favorable to the nonmoving party. *Id.*, citing *Davis* at 64, 66, citing *Murphy* at 358-359.

{¶ 18} We review the trial court's grant of summary judgment under a de novo standard of review. *Premiere Radio Networks, Inc.*, 2019-Ohio-4015, ¶ 6 (10th Dist.), citing *Capella III, L.L.C. v. Wilcox*, 2010-Ohio-4746, ¶ 16 (10th Dist.). "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." *Id.* at ¶ 6.

## V. LEGAL ANALYSIS

{¶ 19} In his sole assignment of error, Croley argues that the trial court erred by granting the appellees' motion for summary judgment. Specifically, Croley argues that there is a reasonable dispute of fact as to his hostile work environment and retaliation claims that make summary judgment inappropriate. For the following reasons, we agree.

### A. Hostile Work Environment

{¶ 20} A hostile work environment is a workplace that is "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]' " (Citations omitted.) *Chapa v. Genpack, L.L.C.*, 2014-Ohio-897, ¶ 54 (10th Dist.), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1996). To succeed on a cause of action for a hostile work environment created by racial harassment, the plaintiff must demonstrate: "(1) the employee is a member of a protected class, (2) the harassment was unwelcome, (3) the harassment was based on race, (4) the harassment had the effect or purpose of unreasonably interfering with the employee's work performance or of creating an intimidating, hostile, or offensive work environment, and (5) employer liability through respondeat superior." (Citation omitted.) *Hinton v. Ohio Dept. of Youth Servs.*, 2022-Ohio-4783, ¶ 33 (10th Dist.).

### 1. Noose Incident

{¶ 21} Croley first offers the noose incident in support of his hostile work environment claim. As alleged, on January 14, 2020, Croley was expressly directed by

Pennington, the general manager of Frank Road Recycling, to operate the compactor. After some training, Croley discovered that a noose was hung from the rearview mirror of the compactor.

{¶ 22} The first prong is easily satisfied as Croley, an African American male, is a member of a protected class. It is also apparent from the record that Croley has satisfied the second and third prongs of the analysis. The noose, and the threat it represents, must not be lost in this discussion. "Those of us for whom a particular symbol is just that -- a symbol -- may have difficulty appreciating the very real, very significant fear that such symbols inspire in those to whom they are targeted. No less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear." *Vance v. S. Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1583 (11th Cir. 1993) (Fay, J., dissenting). The noose is a symbol of this nation's violent legacy against African Americans and brings them " 'the grim specter of racially motivated violence' that continues today." *Little v. NBC*, 210 F.Supp.2d 330, 390 (S.D.N.Y. 2002), quoting *Williams v. New York City Hous. Auth.*, 154 F.Supp.2d 820, 824 (S.D.N.Y 2001); *see also Johnson v. Potter*, 177 F.Supp.2d 961, 965 (D.C.Minn. 2001) (writing that the image of a noose is "deeply a part of this country's collective consciousness and history, any explanation of how one could infer a racial motive appears quite unnecessary"). The noose is "among the most repugnant of all racist symbols, because it is *itself* an instrument of violence." (Emphasis added.) *Williams* at 824.

{¶ 23} Historically, the noose is forever "linked to lynching, the Ku Klux Klan ("KKK"), and the murdering of thousands of African-Americans." Tess Godhardt, *Reconciling the History of the Hangman's Noose and its Severity Within Hostile Work Environment Claims*, 51 J.Marshall L.Rev. 137, 137 (2017). While reporting on lynching was not prevalent until the late 1870s, recent studies have determined that 3,959 African Americans were lynched within the United States from 1877 to 1950. (Citation omitted.) *Id*. at 144.[1] "The effect of such violence on the psyche of African-Americans cannot be exaggerated. Sociologists have explained that lynching was employed to maintain

---

[1] Though it should be noted that any such estimates of lynching are understandably underreported, other articles have provided similar statistical figures. *See, e.g.*, Tyiarah Adewakun, *Hanging on to Justice: Why the Display of a Hangman's Noose in the Workplace Gives Rise to a Racially Hostile Work Environment*, 20 Rutgers Race & L.Rev. 13, 15-16 (2018) (writing that the NAACP has reported that from 1882-1968, at least 3,446 African Americans were lynched).

dominance whenever it suited whites to reaffirm their mastery or blacks challenged or seemed about to test the established contours of their subordination." (Internal quotation marks deleted and citations omitted.) *Williams* at 824. As recent as 2007, "[t]he National Association for the Advancement of Colored People declared a State of Emergency in which they reported that forty-three noose hangings had occurred since early 2006." Godhardt at 144.

{¶ 24} The dissent contends that "[o]ther than the noose, there are no credible allegations of any race-based comments or other activity involving race. The noose is not connected to any threatening intent or racial animus by Frank Road Recycling." (Dissent at ¶ 116.) Given the well-known racist and violent history of lynching in this country, the dissent's claim strains credulity. Even today, the noose remains one of the most visceral symbols against African Americans based on its association with the practice of lynching. The persistent inequality in this country resuscitates for modern African Americans these same fears from years ago. Jeannine Bell, *The Hangman's Noose and the Lynch Mob: Hate Speech, Hate Crime and Jena 6*, 44 Harv. C.R.-C.L. L.Rev. 329, 345 (2009). Courts have noted that "[t]he noose in [the workplace] context is a symbol not just of racial discrimination or of disapproval, but of terror." *Vance* at 1583 (Fay, J., dissenting). Unfortunately, allegations by employees regarding the display of nooses within the workplace persist. One study regarding racial discrimination and harassment claims noted that "[a]ctual physical objects, such as nooses or [KKK]-associated attire, are left for plaintiffs in their work space (and occasionally at the work site more generally) in 5.8% of the cases." Pat K. Chew and Robert E. Kelley, *Unwrapping Racial Harassment Law*, 27 Berkley J. Emp. & Lab.L. 49, 74 (2006). For the reasons above, we conclude the act of hanging a noose on the mirror of an African American's vehicle is undoubtedly an unwelcome form of harassment based on race.

{¶ 25} The fourth element requires us to determine whether the alleged harassment had the effect or purpose of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment. Stated another way, we must determine whether the work environment was sufficiently hostile to alter the conditions of employment. *Hinton* at ¶ 36, citing *Chapa* at ¶ 34. Factors a reviewing court shall consider include: "(1) the frequency of the discriminatory conduct, (2)

its severity, (3) whether the conduct is physically threatening or humiliating, or whether it is a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance." (Internal quotation marks deleted and citations omitted.) *Id.*; *see also Harter v. Chillicothe Long-Term Care, Inc.*, 2012-Ohio-2464, ¶ 19 (4th Dist.), quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (" 'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' ").

{¶ 26} When resolving whether the conduct was "severe or pervasive enough" to alter the conditions of employment, a reviewing court "must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of [] abusive treatment." *Hampel v. Food Ingredients Specialties*, 89 Ohio St.3d 169 (2000), paragraph five of the syllabus. The "totality of the circumstances" standard in hostile work environment claims "precludes the kinds of analysis that carves the work environment into distinct harassing incidents to be judged each on its own merits." (Internal quotation marks deleted and citations omitted.) *Tod v. Cincinnati State Technical & Community College*, 2011-Ohio-2743, ¶ 52 (10th Dist.). While we must review the work environment as a whole, the greater severity of the harassing behavior requires a lesser degree of pervasiveness to reach a level that liability attaches. *Hampel* at 181. "There is neither a threshold 'magic number' of harassing incidents that give rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." (Internal quotations marks deleted and citations omitted.) *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 21, fn. 5 (2d Cir. 2012). While the dissent contends that Croley's hostile work environment claim is deficient as "he has not shown a regular pattern of racist conduct sustained over time," *see* dissent at ¶ 123, Croley is not required to demonstrate a particular number of incidents.

{¶ 27} In fact, a single incident may create a hostile work environment. *Reed v. Procter & Gamble Mfg. Co.*, 556 Fed.Appx. 421, 434, fn. 2 (6th Cir. 2014) ("only one or two incidents of race-based harassment may be so severe as to constitute a hostile work environment"). While a single incident must be "extraordinarily severe" to constitute a hostile work environment, *see Williams v. New York City Housing Auth.*, 61 F.4th 55, 69

(2d Cir. 2023), an employee "need not endure threatened or actual physical assault before a reasonable factfinder could conclude that she endured 'severe' harassment within the meaning of Title VII." *Richardson v. New York State Dept. of Corr. Servs.*, 180 F.3d 426, 440 (2d Cir. 1999). The Supreme Court of Ohio has found that " 'federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112.' " *Brown v. Corr. Reception Ctr.*, 2020-Ohio-684, ¶ 21 (10th Dist.), quoting *Little Forest Med. Ctr. v. Ohio Civ. Rights Comm.*, 61 Ohio St.3d 607, 609-610 (1991). Thus, we will refer to relevant federal case law when appropriate.

{¶ 28} Indeed, it is important to recognize that stating a single incident of workplace conduct *rarely* can create a hostile work environment is far different than stating that a single incident can *never* create a hostile work environment. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring). By way of example, several federal circuit courts of appeals have found that the single use of a racial slur by a supervisor can amount to sufficiently severe conduct to support a hostile work environment claim. *See, e.g.*, *Woods v. Cantrall*, 29 F.4th 284, 285 (5th Cir. 2022) (concluding that a supervisor directly calling the plaintiff a "[l]azy [m]onkey ass [n-word]" amounts to an actionable claim of hostile work environment); *Castleberry v. STI Group*, 863 F.3d 259, 264-265 (3d Cir. 2017) (finding that the plaintiffs' allegation that their supervisor called them the n-word could be sufficient to create a hostile work environment cause of action); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (writing that "a reasonable jury could find that [the supervisor]'s two uses of the 'porch monkey' epithet – whether viewed as a single incident or as a pair of discrete instances of harassment – were severe enough to engender a hostile work environment"); *see also Ayissi-Etoh* at 580 (Kavanaugh, J., concurring) ("in my view, being called the n-word by a supervisor – as [plaintiff] alleges happened to him – suffices by itself to establish a racially hostile work environment"). The question becomes whether the act of hanging a noose on the vehicle assigned to an African American male, on his second day of work at the facility, is severe enough conduct to support a hostile work environment claim. We unequivocally answer this question in the affirmative.

{¶ 29} The breadth of noose-related hostile work environment claims is tragically expansive. Federal circuit courts have generally found that the placement of a noose in the workplace, as well as other acts, could reasonably be perceived as severe or pervasive enough conduct to create a hostile work environment. *See, e.g., Banks v. GM, L.L.C.*, 81 F.4th 242, 262-263 (2d Cir. 2023) (concluding that a reasonable jury could find that racist comments, the display of the Confederate flags on employees' vehicles and clothing, and the display of multiple nooses near the workstations of African American employees created a hostile work environment); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 146, 152 (2d Cir. 2014) (finding the "insults, slurs, evocations of the [KKK], statements comparing black men to apes, death threats, and the placement of a noose dangling from the plaintiff's automobile" "far surpassed any threshold necessary to demonstrate a hostile and abusive work environment"); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1253 (11th Cir. 2014) (finding, in relevant part, a genuine issue of material fact existed whether the plaintiff's work environment was objectively hostile based on repeatedly observing racist graffiti, the display of Confederate flag apparel on numerous occasions, a white supervisor twice calling him "blue gums," and hearing about the display of a noose)[2]; *Porter v. Erie Foods Internatl., Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (determining the display of multiple nooses and "veiled threats" by coworkers rose to the level of a hostile work environment); *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1141-1142 (10th Cir. 2008) (finding there was a dispute of fact whether the display of a noose "where it was most likely to be seen and where it could have maximum effect," racist graffiti, a coworker's racist remarks, a supervisor's use of the term "boy," and a "slaves email" created a hostile work environment); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 883-887 (6th Cir. 2008) (upholding the verdict for plaintiff's hostile work environment claim based on the display of nooses, offensive flyers and graffiti, and various racist remarks); *Auston v. Clarksville*, 244 Fed. Appx. 639, 652 (6th Cir. 2007) (affirming the district court's judgment, in relevant part, as the display of a single noose in a police station for four months and several racially tinged incidents were sufficient to create a hostile work environment); *Hollins v. Delta*

---

[2] The *Adams* court wrote "[the plaintiff] heard about the noose, which is a severe form of racial harassment, but his experience was less severe because he did not see it firsthand. Although it is a closer question than [the other employees], a reasonable jury could find that his work environment was objectively hostile." *Adams* at 1253.

*Airlines*, 238 F.3d 1255 (10th Cir. 2001) (concluding there was a genuine issue of material fact that the display of several hangman's nooses, as well as racist jokes, were severe or pervasive enough conduct to constitute a hostile work environment); *EEOC v. Northwest Airlines, Inc.*, 188 F.3d 695, 702 (6th Cir. 1999) ("Clearly the presence of nooses and [KKK] symbols in the workplace, if ignored by [the employer], is the type of discriminatory conduct that might warrant general injunctive relief."). Numerous federal district courts have reached similar conclusions. *See, e.g.*, *Taylor v. Cooper Power & Lighting*, 2024 U.S. Dist. LEXIS 85402, *18-19 (E.D.N.Y. May 10, 2024) (finding the display of two nooses coupled with a physical threat were enough to demonstrate a hostile work environment claim); *Saunders v. D.T. Read Steel Co., Inc.*, 2019 U.S. Dist. LEXIS 241652, *4 (W.D.Ky. May 16, 2019) (denying the defendant's motion to dismiss as a coworker's use of a noose and statement to a group of minorities that "[t]his is what I do to the son of a bitch that steals my tools. I hang that son of a bitch" could constitute a hostile work environment); *Brown v. Magna Modular Sys.*, 2014 U.S. Dist. LEXIS 90200 (N.D.Ohio July 2, 2014) (denying a motion to dismiss a hostile work environment claim based on allegations that the plaintiff was subjected to racially abusive language, and that he observed a noose constructed and hung in his workplace by a white coworker); *Ferguson v. Walmart*, 2014 U.S. Dist. LEXIS 608 (C.D.Cal. Jan. 2, 2014) (finding that the plaintiff demonstrated a prima facie case of hostile work environment based on allegations that he was subject to racial slurs and the placement of a noose on a forklift); *Wilson v. New York City Dept. of Transp.*, 2005 U.S. Dist. LEXIS 21620, *21-22 (S.D.N.Y. Sept. 28, 2005) (denying the defendant's motion for summary judgment of a hostile work environment claim based on repeated use of racist nicknames, a threatening letter, and the display of a noose). Courts have even recognized that references to lynching and nooses can contribute to a hostile work environment. *Allen v. Michigan Dept. of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999) (finding racist insults and a threatening letter signed by the "KKK" "contain[ing] a reference to lynching, [and] a drawing of a stick figure with a noose around its neck" constituted a hostile work environment).

{¶ 30} Even as the sole alleged conduct, the display of two nooses or one noose for an extended period can constitute severe enough conduct to establish a hostile work environment. *See, e.g.*, *Brown v. Orange & Rockland Util., Inc.*, 594 F.Supp.2d 382, 392-

393 (S.D.N.Y. 2009) (finding the display of two nooses that were targeted at the plaintiff amounted to severe or pervasive enough conduct to defeat summary judgment of a hostile work environment claim); *see also Williams*, 154 F.Supp.2d 820. In *Williams*, two African American employees alleged that a white supervisor displayed a noose in his office for three days. *Id*. at 823. The *Williams* court found this incident alone was sufficient to constitute a hostile work environment writing "there can be little doubt that such a symbol [a noose] is significantly more egregious than the utterance of a racist joke. . . . It is impossible to appreciate the impact of the display of a noose without understanding this nation's opprobrious legacy of violence against African-Americans." *Id*. at 823-824.

{¶ 31} Tailoring our review even further, several courts have concluded that the single display of a noose, even if for a short time, may constitute severe enough conduct to create a hostile work environment. In *Smith v. Hempstead Dept. of Sanitation Sanit. Dist. No. 2*, 798 F.Supp.2d 443, 452 (E.D.N.Y. 2011), the plaintiffs alleged that they observed a noose hanging in the central garage where the workers gathered. *Id*. at 448. The plaintiffs brought a hostile work environment claim based on the noose incident, as well as allegations of the use of the n-word and discrimination. *Id*. at 452. The *Smith* court rejected the plaintiffs' claims of discrimination that were not sworn to and not supported by the evidence. The district court also rejected the plaintiffs' claims involving the use of the n-word as the alleged employee who used the word had been suspended for his conduct. *Id*. Nonetheless, the district court found that the single instance of the display of a noose in the workplace was severe enough to alter the working conditions of the African American employees, creating a hostile work environment. *Id*. at 453. The *Smith* court noted that "even [the] limited display of a noose can quickly precipitate a hostile work environment." *Id*. Similarly, in *Rosemond v. Stop & Shop Supermarket Co.*, 456 F.Supp.2d 204, 207 (D.C.Mass. 2006), the plaintiff discovered a noose hanging from the ceiling of his work area. The district court found that there was sufficient evidence for a reasonable jury to conclude that the single display of a noose, alone, without consideration of the other alleged incidents, was severe enough that it could alter the conditions of his employment. *Id*. at 213-214. "In short, the court believes that a reasonable jury could determine that the noose incident, in and of itself, demonstrated that Plaintiff was subjected to a racially-hostile work environment." *Id*. at 214.

{¶ 32} Other courts, when considering a series of allegations that form the basis of a hostile work environment claim, have indicated that the single display of a noose, alone, is sufficient to create a hostile work environment. *See Banks* at 265 ("A reasonable jury could find that even a single placement of this object [a noose] -- imbued as it is with historical gravity as a symbol and tool of actual violence -- directly at the workstation of a Black employee could amount to severe conduct sufficient to support an inference that the workplace is hostile to Black employees."); *Burns v. Winroc Corp.*, 565 F.Supp.2d 1056, 1064 (D.C.Minn. 2008) ("Moreover, the noose was discovered after an evening when the truck assigned to [the employee] was the only one parked in the warehouse, suggesting that [the employee] was intended to see it. This incident alone is strong evidence of harassment sufficient to alter the terms, conditions, and privileges of plaintiffs' employment."). *Gales v. California Dept. of Corr. & Rehab. Ventura Youth Corr. Facility*, 2021 U.S. Dist. LEXIS 20949, *67 (C.D.Cal. Jan. 28, 2021) ("Because of the historic significance — particularly to African-Americans — of nooses (actual or depictions thereof), the Court comfortably concludes that a reasonable fact-finder *could* find just this single instance sufficiently severe/pervasive so as to create a hostile work environment."). (Emphasis in original.) At least one legal scholar, in her discussion of sex-based harassment in the workplace, has used the display of a single noose as an example of conduct severe enough to create a racially hostile work environment. *See* Camille Herbert, *Analogizing Race and Sex in Workplace Harassment Claims*, 58 Ohio St. L.J. 819, 880 (1997) ("even one incident of racially threatening conduct-such as hanging a noose over the workstation of a black employee or burning a cross in his or her presence-can itself create a racially hostile work environment"). The dissent claims that the above cases "all have one thing in common— each one involves additional racial conduct, be it offensive words, inappropriate conduct, or racist graffiti." (Dissent at ¶ 131.) Without belaboring the point, the dissent ignores entire paragraphs of the majority decision, *see supra* ¶ 30-32, that plainly state otherwise.

{¶ 33} Certainly, federal circuit and district courts have not universally found that the display of a noose in the workplace is severe enough conduct to create a hostile work environment. In many such cases, the reviewing court focused its analysis on the location of the noose and whether it was sufficiently "directed" at the plaintiff. In *Henry v. Regents of the Univ. of California*, 644 Fed.Appx. 787, 788 (9th Cir. 2016), the plaintiff alleged a

hostile work environment claim based on the display of a noose hung in the inventory warehouse. The Ninth Circuit Court of Appeals affirmed the district court's grant of summary judgment finding that the noose incident, alone, was not severe enough conduct to create a hostile work environment as it was not personally directed at the plaintiff. *Id.* at 788-789. Similarly, in *Thomas v. Amtech*, 464 F.Supp.2d 688, 699 (N.D.Ohio 2006), "[t]he noose was hung in Plaintiff's general work area, but there is no indication the noose was directed at Plaintiff or with the intent to harass Plaintiff because of his race, or that he was physically threatened by it, or that it unreasonably interfered with his work." *See also Hudson v. Cleco Corp.*, 539 Fed.Appx. 615, 620 (5th Cir. 2013) (finding the plaintiff failed to present competent summary judgment evidence that he saw the noose displayed at the training facility or that the noose was directed at him); *Sargent v. Southwest Airlines*, 2012 U.S. Dist. LEXIS 176813, *4-5 (M.D.Tenn. Oct. 30, 2012) (finding that the discovery of an "offensive racial slur in the cargo bin of [the] plane" and a noose hanging from another employee's locker were not sufficiently severe or pervasive enough to constitute a hostile work environment as they were not directed at the plaintiff).

{¶ 34} Some Ohio courts, when determining whether the alleged conduct was severe enough to create a racially hostile work environment, have also considered whether the display of a noose was directed at the African American employee. In *Brown v. Dover Corp.*, 2007-Ohio-2128 (1st Dist.), the First District Court of Appeals affirmed the trial court's grant of summary judgment finding the employee's hostile work environment claim was not severe enough when "(1) Dover allowed unknown employees to post a series of racially offensive pictures, and (2) a noose had been hung at a coworker's station." *Id.* at ¶ 37. The First District explained that Brown "admit[ted]" that the pictures and the noose placed in a coworker's station were not directed at her. *Id.* at ¶ 42, 45. *See also Hargrett v. RMI Titanium Co.*, 2010-Ohio-406, ¶ 43 (11th Dist.) (finding summary judgment appropriate regarding the hostile work environment claim when the noose was not specifically directed at the appellants).

{¶ 35} Before our examination of the above line of cases, we note the dissent cites *Morrisette v. DFS Servs., L.L.C.*, 2013-Ohio-4336 (10th Dist.) for the proposition that it is consistent with *Brown*. (*See* Dissent at ¶ 119.) The dissent, however, badly misinterprets the precedent from our district. In *Morrisette*, DFS began investigating claims that the

appellant had made "racial remarks" to another employee as well as hung a noose in his work area in plain view. *Morrisette* at ¶ 3. The employee also alleged that the appellant made statements about the noose involving the KKK and Emmett Till. *Id.* DFS placed the appellant on leave pending the outcome of the investigation. *Id.* at ¶ 4. When the human resources manager asked if the appellant wanted any personal items from his desk, he remarked that he wanted his briefcase, thermos, and his "gun." *Id.* The appellant was later terminated. The appellant filed a complaint against DFS alleging claims of "age discrimination, breach of contract, promissory estoppel, and wrongful termination in violation of public policy." *Id.* at ¶ 6. After our resolution of the initial appeal, *Morrissette v. DFS Servs., L.L.C.*, 2011-Ohio-2369 (10th Dist.), the trial court ultimately granted the appellees' motion for summary judgment. *Id.* at ¶ 10. We affirmed the trial court's grant of summary judgment finding that we did not need to determine if the appellant made a prima facie showing of age discrimination because he had not come forward with sufficient evidence to show that DFS's proffered legitimate, non-discriminatory reasons for terminating him were pretextual and that age was the "but for" cause of his termination. *Id.* at ¶ 33. We concluded that DFS's decision to terminate the appellant's employment based on the inappropriate comment about having a gun in his desk, his admission that he regularly initiated inappropriate conversations about race, religion, and politics, and his display of a noose in the work cubicle, *id.* at ¶ 34, provided a legitimate non-discriminatory reason for termination. *Id.* at ¶ 36.

{¶ 36} Returning to the cases outside our district, we take issue with the federal and Ohio courts' overreliance on whether the display of a noose was sufficiently directed at the employee. While whether the noose was directed at the employee could plausibly go towards the severity of the conduct, courts often overemphasize this factor failing to hold to account claims that the display of a noose was just a prank, joke, or based on ignorance of the object's violent history. *See Bell* at 338 (examining various explanations provided by defendants for hanging a noose in the workplace). Even in cases where the noose does not appear directed at a particular individual, given the noose's dark legacy, a reasonable African American employee could be forever altered by such a visceral symbol in the workplace. African Americans who observe such a heinous symbol should not be required

to explain the violent history of the noose and how it can invoke fear and anxiety. The threat of a noose is self-evident.[3]

{¶ 37} When courts overly rely on how directed the noose is to the plaintiff, they inadvertently minimize the seriousness of the display of a noose by comparing it to more egregious forms of hostile work environment cases. In contrast to the dissent's analysis, Croley is not required to show that the conduct he experienced was as "overt, severe, or egregious as the conduct experienced by employees in the above-cited cases." (Dissent at ¶ 133.) When considering whether the harassment is severe or pervasive, we employ both an objective and a subjective test. *EEOC v. Village at Hamilton Pointe L.L.C.*, 102 F.4th 387, 401 (7th Cir. 2024), citing *Faragher*, 524 U.S. 775 at 787. The subjective belief of an employee is just one component of our review. *Id.* " '[T]he environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' " *Id.*, quoting *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). Thus, we are not asked to determine if the alleged conduct was the *most* severe. Rather, we are tasked with resolving whether a reasonable person would find the conduct sufficiently severe to alter the conditions of their employment. Simply because there are more outrageous hostile work environment cases does not make the single display of a noose in the workplace any less horrific.

{¶ 38} Regardless, there is evidence that the noose in this case was directed at Croley. On the morning of January 14, 2020, Croley went with the other employees—on his second day on the job—by pickup truck to work in the landfill. (Croley Dep. at 34.) Pennington, traveling in the opposite direction, pulled alongside the truck and instructed the driver to "[m]ake sure the new operator, Jhalil, gets on the compactor." (Croley Dep. at 34.) After completing training, Croley discovered that the rope that was hung on the rearview mirror of the compactor was a noose. As alleged, Pennington directed Croley to operate that very vehicle where the noose was displayed.

---

[3] At least one court has found that the display of a noose was not based on race as the only evidence before the court was that it was intended as a "practical joke" for a white employee and not directed at the African American plaintiff. *See Faulkner v. Niagara Mohawk Power Corp.*, 2006 U.S. Dist. LEXIS 80670, *18, 20 (N.D.N.Y. Nov. 3, 2006). Because Croley is an African American male, the facts in *Faulkner* are plainly distinguishable.

{¶ 39} Even outside the above line of cases, several federal courts have found that the display of a noose in the workplace is not severe enough conduct to create a hostile work environment. In *Reed*, 556 Fed.Appx. 421 at 433, the plaintiff alleged the following incidents as examples of a hostile work environment: Reed received a "threatening" email and hostile phone call; Reed's supervisor created a noose from a telephone cord but Reed was unable to see the gesture; references to "fried chicken and watermelon" in the workplace; the supervisor splashed Reed with an "unknown solution"; and exclusion from lunches and treated in a cold manner by managers. *Id*. at 425. The *Reed* court affirmed the district court's grant of summary judgment as to the plaintiff's hostile work environment claim. Relevant to the instant case, the *Reed* court found that based on the language alleged, the incidents over the phone and email did not have a racial animus. *Id*. at 432. The *Reed* court also found that the record was devoid of evidence that the splashing incident and unfriendly treatment were based on race. *Id*. at 432-433. Finally, the two incidents that had a racial animus, the noose and offensive utterances, could not support a hostile work environment claim. The *Reed* court explained that the offensive gestures or comments were not severe or pervasive enough and fell under the category of "offensive utterance." *Id*. at 433. The noose incident was also found insufficient as "while the telephone cord incident is much more troubling, we note that it is isolated—Reed does not allege that [the supervisor] made any other offensive gestures or comments—and that [the supervisor] did not directly accost or threaten Reed." *Id*. *See also Roberson v. Barretts Business Servs.*, 2019 U.S. Dist. LEXIS 150327, *19 (D.C.Del. Sept. 4, 2019) (finding the act of leaving a cellphone charging cord shaped as a noose in a desk drawer was not pervasive nor severe enough to satisfy the requirements of a hostile work environment); *Artis v. Finishing Brands Holdings*, Inc., 639 Fed.Appx. 313, 324 (6th Cir. 2016) (finding the alleged conduct involving "a few" potentially racist comments, a rubber chicken hung by a noose in an unfinished office addition, and racist graffiti in the bathroom of the workplace were not severe or pervasive enough conduct to create an actionable hostile work environment claim).

{¶ 40} There is some distinction, albeit minor, that the nooses in *Reed* and *Roberson* were from cords versus an actual rope. The lack of functionality of the noose would go to the severity of the threat. A similar argument could be made that the use of the rubber

chicken in *Artis* mitigated the severity of the hostile act. However, in addition to disagreeing with the premise that leaving a noose at an employee's desk, *see Reed*, or the display of a rubber chicken hung by a noose, *see Artis*, does not constitute a severe enough act to create a hostile work environment, the precedential value of *Reed* and *Artis* is at least thrown into some doubt as the Sixth Circuit Court of Appeals recently addressed a similar question in *Rembert v. Swagelok Co.*, 2023 U.S. App. LEXIS 10333 (6th Cir. Apr. 26, 2023).

{¶ 41} In *Rembert*, the plaintiff, in relevant part, alleged a hostile work environment cause of action based on claims that his supervisors and coworkers routinely used the n-word, and one coworker threatened him with a noose. *Id.* at *7. The *Rembert* court reversed the district court's grant of summary judgment finding there was a dispute of fact that the use of the n-word and threat with a noose were severe enough harassment to preserve a hostile work environment claim. *Id.* Of note, the *Rembert* court explained its reasoning as follows:

> If a jury were to credit the testimony about the N-word *alone*, it could reasonably conclude that Rembert was subject to severe or pervasive harassment. *See Johnson* [*v. Ford Motor Co.*], 13 F.4th [493, 505 (6th Cir. 2021)] ("Comments and harassing acts of a continual nature are more likely to be deemed pervasive and evidence of an objectively hostile work environment." (cleaned up)). Additionally, a jury could conclude that in light of these comments, a coworker holding up a noose and telling Rembert "this is what we do here" was a physical threat. *See Williams* [*v. CSX Transp. Co.*], 643 F.3d [502, 512 (6th Cir. 2011)].

(Emphasis added.) *Rembert* at *7-8.[4]

{¶ 42} In 1989, the Eleventh Circuit Court of Appeals wrote, "[i]t is hard to imagine an incident of this sort taking place. . . . The grossness of hanging an object resembling a noose at the work station of a black [person] is self-evident." *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, fn. 4 (11th Cir. 1989). Over 40 years since the events in *Vance*, African Americans are still forced to navigate the same types of abuses in the workplace.

{¶ 43} To be sure, there is a competing body of law concluding the display of a noose in the workplace does not create a hostile work environment. *See, e.g., Martin v. Am.*

---

[4] Curiously, while the district court in *Rembert* cited *Reed*, the Sixth Circuit decision makes no reference to the case. *See Rembert v. Swagelok Co.*, 604 F.Supp.3d 670, 698 (N.D.Ohio 2022). Moreover, neither case cites *Artis* in their decision.

*Midstream Partners*, LP, 386 F.Supp.3d 733, 740 (E.D.La. 2019) (collecting hostile work environment cases out of the Fifth Circuit Court of Appeals involving the display of a noose in the workplace); *Mays v. Hempstead*, 2012 U.S. Dist. LEXIS 165062, *7 (E.D.N.Y. Nov. 16, 2012) (finding the display of a black-faced doll found hanging from a noose off the back of a forklift was not severe enough conduct to create a hostile work environment); *McCoy v. New York*, 131 F.Supp.2d 363 (E.D.N.Y. 2001) (finding a noose hanging in the working area of the facility and the display of a racially offensive advertisement were not severe enough conduct to create a hostile work environment). At this phase of the case, however, we are limited to determining whether a dispute of fact exists for trial. Given the line of cases that have found that the single display of a noose in the workplace can create a hostile work environment, we find it is the province of the jury to determine whether the alleged conduct in this case is severe or pervasive enough to demonstrate a hostile work environment claim. What the dissent proposes is that, as a matter of law, leaving a noose in the vehicle of an African American male does not constitute a severe enough act, without more, to create a hostile work environment. In good conscience, we cannot support such an approach. While a jury could very well find that the alleged incident was not severe enough conduct to create a hostile work environment claim, the argument that hanging a noose in the excavator that Croley was assigned to operate could not, as a matter of law, sufficiently alter the conditions of employment for an African American is untenable. *Williams*, 154 F.Supp.2d 820 at 826.

{¶ 44} As to the final prong, Croley must demonstrate that there is a specific basis for attributing the conduct that created the hostile environment to the employer. The requirements for demonstrating employer liability differ, depending on whether the alleged harasser is classified as a supervisor or a coworker. *Chapa*, 2014-Ohio-897, at ¶ 70 (10th Dist.). In *Chapa*, we explained:

> When the alleged harasser is a supervisor, the employer may be vicariously liable. *Burlington* [*Industries, Inc. v. Ellerth*], 524 U.S. [742, 763-765] [1998]. . . . Under this scenario, when harassment by a supervisor with authority over the employee culminates in a tangible employment action against the plaintiff, the employer is subject to vicarious liability and the analysis ends. *Id.* . . . Where no tangible employment action was taken, but a hostile work environment was created, the employer may avail itself of an affirmative defense to liability. To successfully raise this affirmative defense, an employer must establish two elements by a preponderance of the

evidence: first, that the employer exercised reasonable care to prevent and correct properly any . . . harassing behavior, and second, that the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

(Citation omitted.) *Chapa* at ¶ 70.

{¶ 45} The Sixth Circuit Court of Appeals has defined a "supervisor" as "an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." (Quotation marks deleted and citations omitted.) *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994). Here, Croley has alleged that Pennington, the general manager of Frank Road Recycling, expressly directed him to operate the excavator where the noose was displayed. Because Pennington hired Croley and operated as the general manager of the facility, there is little doubt that Pennington qualifies as a supervisor, and there is a specific basis for attributing the conduct that created the hostile work environment to the employer.

{¶ 46} The appellees' have raised as an affirmative defense that summary judgment is warranted because Frank Road Recycling took reasonable steps to correct the harassing behavior, and Croley unreasonably failed to take advantage of any corrective opportunities by the appellees or to otherwise avoid the harm. We disagree. Upon reporting the noose incident to Reliable Staffing, Croley spoke with Pennington and informed him that the noose was located outside the employee trailer. Despite providing this information, the noose was left outside the employee trailer until Croley picked it up after his lunch break. (Croley Dep. at 68-69.) At the end of the shift, Pennington asked to see the rope. (Croley Dep. at 72-73.) Croley retrieved the rope from his vehicle and provided it to Pennington. When Pennington wanted to keep the rope, Croley refused. (Croley Dep. at 72-73.) Croley stated that he did not trust anyone. (Croley Dep. at 73.) Given the allegations and Pennington's failure to retrieve the noose from outside the employee trailer earlier in the day, a jury could view Croley's actions as reasonable under the circumstances. Moreover, subsequent actions by Loewendick could also be perceived as unreasonable efforts to investigate or take corrective action. While Loewendick stated that he had started an investigation into the noose incident, he acknowledged that when he met Croley, he had not collected any samples of rope from around the worksite to compare it with the noose.

(Loewendick Dep. at 26.)  Loewendick also never called law enforcement to report the incident.  (Loewendick Dep. at 30.)

{¶ 47}  Conversely, the morning the noose incident was reported, Pennington stated to Croley that they would begin investigating the incident.  (Loewendick Dep. at 63-64.)  On January 23, 2020, Croley met with representatives from Frank Road Recycling who stated that any racial discrimination at the company would not be tolerated.  (Croley Dep. at 93-94.)  Loewendick also testified that they interviewed employees present on the day the alleged noose was discovered.  (Loewendick Dep. at 24.)  It is the province of the jury to resolve whether the appellees took reasonable steps to correct the alleged behavior.  Furthermore, there is a dispute of fact whether Croley unreasonably failed to take advantage of any preventative or corrective opportunities that the employer provided.  The appellees commenced an investigation into the matter and met with Croley.  Croley agreed to show them the noose but refused to leave the noose or allow it to be cut for comparison with other rope at the worksite.  Croley explained that he did not feel comfortable turning over the noose or allowing them to cut a piece of it because he did not trust Loewendick.  It is for the jury to resolve these factual disputes.  Based on the foregoing, under Civ.R. 56 review, we find that the noose incident, alone, could provide a sufficient basis to support a hostile work environment claim.

**2. Window Incident**

{¶ 48}  While we believe that the noose incident is severe enough to support a hostile work environment claim, under the totality of the circumstances analysis, we cannot look at each event in isolation.  Croley has also alleged several other incidents that contributed to the hostile work environment.

{¶ 49} On January 21, 2020, Croley was assigned to operate an excavator while another employee was on break.  (Croley Dep. at 83.)  Croley alleged that while he operated the excavator in an open area of the landfill, something struck the glass on the cab of the excavator, which caused it to shatter.  Croley alleged that the incident was "just as intentional as the noose."  (Croley Dep. at 99.)  Croley posited that the window shattered from a BB or pellet gun but conceded that he did not find a BB or pellet in the vehicle.  (Croley Dep. at 81-82, 86, 90-91.)  However, Croley has provided a specific basis for his belief that the window was struck by a BB or pellet.  According to Croley, before the

excavator was parked, he observed that "the glass was still intact, it was just a small hole, but the whole glass was shattered." (Croley Dep. at 89.) Croley also testified that when he looked up after the incident, he saw Pennington's truck parked on the top of the landfill hill. (Croley Dep. at 81-82.)

{¶ 50} Turning to the hostile work environment factors, the first, second, and fourth factors are satisfied as Croley is an African American and the harassment alleged, i.e., intentionally shooting an object at his vehicle, would be a severe and unwelcome form of harassment. Concerning the third factor, there is a dispute of fact that the alleged incident was based on race. We do not have to consider the window incident in insolation. "Conduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, []he would not have been the object of harassment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). As the window incident occurred only a week after the display of the noose, we find, considering the evidence in a light most in favor of the nonmoving party, the incident amounts to threatening conduct that indicates a willingness to act on the statement made by the noose incident. Because the window incident amounts to a physical threat of violence, the implicit threat from the noose is heightened and, based on the close sequence of events, could reasonably be construed to have a racial animus. Finally, there is a dispute of fact as to liability as Croley claims that Pennington's vehicle was in the immediate vicinity when the glass shattered.

{¶ 51} The appellees contend that there is no genuine dispute of fact regarding the window incident as there was no evidence of a BB or pellet in the debris. Pennington averred in his affidavit that "[d]ue to the nature of work at Frank Road Recycling Solutions in picking up and moving pieces of construction debris, it is not uncommon for the glass in the equipment to break or shatter." (Pennington Aff. at ¶ 10.) The dissent agrees with the appellees finding Pennington's affidavit credible but Croley's affidavit self-serving regarding the window incident. We are not persuaded. Both Croley and Pennington provide some basis in support for their accounts of the window incident. Under Civ.R. 56 review, however, we are to consider the evidence in a light most in favor of the nonmoving party. To survive Civ.R. 56 review, the nonmoving party must respond, by affidavit or other evidence provided under Civ.R. 56, with specific facts demonstrating a genuine issue of

material fact exists for trial. *Kiser v. United Dairy Farmers*, 2023-Ohio-2136, ¶ 14 (10th Dist.). The types of evidence permitted under Civ.R. 56(C) are pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact. *Id.* Here, Croley has provided Civ.R. 56 evidence through his deposition testimony to support his claims involving the window incident.

{¶ 52} A reasonable jury could find Croley's account credible alleging that the glass shattering was an intentional act based on the small hole in the glass before it shattered, observing Pennington's vehicle immediately after the incident, and that the incident took place shortly after discovering the noose in his compactor. On the other hand, given the lack of physical evidence and averments from Pennington, a jury could also find that Croley is not credible and conclude that the window shattered from some other means, such as a rock or debris. While the dissent contends that Croley's affidavit is self-serving, speculative, and conclusory testimony, *see* dissent at ¶ 106, the same could be said for Pennington's account, which provided no data or other corroborating evidence in support of his assertion regarding broken or shattered glass. Croley, at the very least, has provided a specific basis for why he believed the glass shattered from a BB or pellet gun. Ultimately, this is a question for the trier of fact to resolve. "Credibility issues typically arise in summary judgment proceedings when one litigant's statement conflicts with another litigant's statement over a fact to be proved. Since resolution of the factual dispute will depend, at least in part, upon the credibility of the parties or their witnesses, summary judgment in such a case is inappropriate." *Turner v. Turner*, 67 Ohio St.3d 337, 341 (1993). It is not our role to determine a disputed fact or weigh the credibility of the evidence, only to resolve whether there exists a genuine dispute of material fact. *Id.* at ¶ 16.

### 3. Excessive Discipline, Working Alone, and Police Report

{¶ 53} Croley next alleges that he was subject to excessive discipline when he was given a written warning for driving in a high gear. (Appellant's Brief at 34-35.) Upon review, we cannot find that the written warning contributed to the hostile work environment claim. Even viewing the evidence in a light most favorable to the nonmoving party, Croley admits that he was not aware of the write-up, or any type of discipline, prior to his termination. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240 (11th Cir. 2014) ("We now hold that an employee alleging a hostile work environment cannot complain about

conduct of which he was oblivious for the purpose of proving that his work environment was objectively hostile."); *see also Davis v. New York Dept. of Corr.*, 256 F.Supp.3d 343, 354, fn. 7 (S.D.N.Y. 2017), citing *Varughese v. Mt. Sinai Med. Ctr.*, 2015 U.S. Dist. LEXIS 43758, *61 (S.D.N.Y. Mar. 27, 2015). Here, Croley acknowledged that he was not aware of the disciplinary write-up, or even a verbal warning, until he filed his complaint. (Croley Dep. at 118-120.)

{¶ 54} Croley also alleges that he was "ostracized from the other employees and forced to work on the side of [a] cliff in a dangerous location." (Appellant's Brief at 35.) However, Croley repeatedly undercut this argument by stating that he "had no problem with" the work and found it a "very doable job." (Croley Dep. at 106.) Croley acknowledged that he saw two other employees on excavators at the landfill clearing out trucks during the same time. (Croley Dep. at 106.) Given Croley's own statements, the alleged incident fails to further his hostile work environment claim.

{¶ 55} Finally, Croley contends that Loewendick's call to law enforcement for alleged threats to another employee supports his hostile work environment cause of action. While it should be noted that the record indicates Croley made no direct threats, and no legal action was taken, this incident also does not bolster his hostile work environment claim as it occurred after Croley was terminated. (Loewendick Dep. at 31.) " 'Plaintiff cannot use events that happened after his termination to support his hostile work environment claim.' " *Rajcoomar v. Bd. of Edn.*, 2017 U.S. Dist. LEXIS 35813, *19-20 (S.D.N.Y. Mar. 13, 2017), quoting *Reid v. Aransas Cty.*, 805 F.Supp.2d 322, 335 (S.D.Tex. 2011). Therefore, we cannot consider the allegation as part of Croley's hostile work environment cause of action.

{¶ 56} Based on the foregoing, we find the trial court erred by granting the appellees' motion for summary judgment regarding Croley's hostile work environment claim.

## B. Retaliation

{¶ 57} Next, Croley argues that the trial court erred by granting the appellees' motion for summary judgment as to his retaliation cause of action.

{¶ 58} R.C. 4112.02(I) provides that it is an unlawful discriminatory practice "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in [R.C. 4112.02] or because that

person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." To establish a prima facie case of retaliation, under R.C. 4112.02(I), a plaintiff must first establish

> (1) the plaintiff engaged in a protected activity, (2) the employer knew the plaintiff engaged in the protected activity, (3) the employer subjected the plaintiff to an adverse employment action, and (4) a causal link existed between the protected activity and the adverse action.

(Quotation marks deleted.) *You v. Northeast Ohio Med. Univ.*, 2018-Ohio-4838, ¶ 65 (10th Dist.), quoting *Dautartas v. Abbott Laboratories*, 2012-Ohio-1709, ¶ 49 (10th Dist.).

**{¶ 59}** If the plaintiff demonstrates a prima face case of retaliation, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory basis for its actions. *Id*. at ¶ 66, citing *Greer-Burger v. Temesi*, 2007-Ohio-6442, ¶ 14, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer satisfies its burden, the burden shifts back to the plaintiff to show that the purported reason was not the real reason for the employment decision. *Id*. Because of the similarities between R.C. 4112.02(I) and Title VII of the Civil Rights Act of 1964, Ohio courts cite federal case law as instructive in interpreting retaliation claims. *Childs v. The Kroger Co.*, 2023 Ohio App. LEXIS 2745, *53 (10th Dist. Aug. 3, 2023).

**{¶ 60}** Croley has alleged that he was engaged in a protected activity by complaining to Pennington and management as to the display of the noose and opposing Loewendick's request to turn over, or cut a portion of, the noose. As a result, Loewendick terminated Croley for insubordination and impeding the investigation. Croley contends that his refusal to participate in the investigation, by not handing the noose over or allowing it to be cut, was justified under the circumstances.

**{¶ 61}** " 'An employee's activity is "protected" for purposes of R.C. 4112.02(I) if the employee has "opposed any unlawful discriminatory practice" (the "opposition clause") or "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code" (the "participation clause").' " *Maas v. JTM Provisions Co.*, 2025 U.S. Dist. LEXIS 46309, *35 (S.D.Ohio Mar. 13, 2025), quoting *Veal v. Upreach, L.L.C.*, 2011-Ohio-5406, ¶ 18 (10th

Dist.), citing *HLS Bonding v. Ohio Civ. Rights Comm.*, 2008-Ohio-4107, ¶ 15 (10th Dist.). A plaintiff engages in protected opposition activity through an overt stand against the purported illegal discriminatory action. *Childs v. The Kroger Co.*, 2023-Ohio-2034, ¶ 101 (10th Dist.). The opposition clause covers conduct such as " 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer—e.g., former employers, union, and co-workers.' " *Maas* at *36, quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).

{¶ 62} Here, there is no dispute that Croley initially appeared and met with the appellees on January 24, 2020. During the meeting, Croley allowed Loewendick to see the noose but refused to turn it over to Frank Road Recycling. (Croley Dep. at 95; Loewendick Dep. at 18.) According to Loewendick, Croley stated, "I'm not giving it to you, I don't trust you." (Loewendick Dep. at 18.) Loewendick then proposed to cut a piece off the end of the rope to compare it with other rope on the premises, but Croley refused. As a result, Loewendick terminated Croley for insubordination and impeding the investigation into the noose incident.

{¶ 63} The trial court relied on *Merkel v. Scovill, Inc.*, 787 F.2d 174 (6th Cir. 1986), for the proposition that nonparticipation in an investigation is "only" protected when the defendant pressures the plaintiff to give a false statement or to provide evidence he did not possess. (Aug. 10, 2023 Decision and Entry at 27.) However, the proposed reading of *Merkel* is far narrower than the decision provides. As the Sixth Circuit Court of Appeals wrote in *Merkel*:

> Preliminarily, we note that § 623(d) of the [Age Discrimination in Employment Act ("ADEA")] in terms prohibits discrimination against an employee because the employee "participated in any manner in an investigation" under the ADEA. Thus, at least arguably and as Scovill contends, discrimination against an employee for lack of participation or nonparticipation in an investigation would not be a violation of the ADEA. This may be true as a general proposition. *However, we believe, in view of the remedial purpose of the ADEA, that there may well be exceptions to this proposition. For example*, if an employer, in the course of an investigation, seeks a statement from an employee that the employer knows or should know to be false, or the employer does not reasonably believe that the employee has the sought-for information, and the

employee refuses, discrimination or retaliation against the employee for such nonparticipation may well be a violation of the ADEA.

(Emphasis added.) *Merkel* at 179-180.

{¶ 64} Stated another way, the *Merkel* court held that the lack of participation in an investigation is not inherently fatal to a retaliation claim. While the *Merkel* court agreed that, as a general proposition, the discrimination against an employee for nonparticipation in the investigative process was not a violation of the statute, they provided examples where refusal to participate in the investigation of reported discriminatory conduct is considered protected activity. In contrast to the trial court's interpretation, these examples are not the *only* such instances where these exceptions might apply.

{¶ 65} We believe that Croley's refusal to turn over the noose or allow it to be cut falls into the category of the exceptions provided in *Merkel*. Considering the evidence in a light most favorable to Croley, a jury could reasonably determine that turning over evidence to a supervisor you do not trust, or allowing that evidence to be damaged, is a reasonable nonparticipation in the investigative process. This interpretation is bolstered by the fact that when Croley initially informed Pennington of the noose's location outside the employee trailer, Pennington failed to retrieve and secure the noose. Furthermore, Croley, despite his trepidations, repeatedly allowed the noose to be inspected. A jury could reasonably believe Croley's explanation that his claim could be hindered if the noose was damaged or not be properly preserved. Conversely, the appellees' have represented that they wanted the noose to aid in the investigation. Given the accusation at issue, there is at least a dispute of fact that Croley's fears were justified.

{¶ 66} The trial court relied on *Thomas v. Norbar, Inc.*, 1987 U.S. App. LEXIS 9533 (6th Cir. July 14, 1987) and *Harris v. Fulton-Dekalb Hosp. Auth.*, 255 F.Supp.2d 1347, 1358 (N.D.Ga. 2002), for the proposition that refusal to participate in the investigation of reported discriminatory conduct is not a protected activity. In *Thomas*, the plaintiff was asked by his supervisor to meet with a representative from the Ohio Civil Rights Commission investigating allegations against the company. *Thomas* at *4-5. The plaintiff was reluctant to speak with the investigator. *Id.* at *5. The *Thomas* court reversed the district court finding that the plaintiff's reluctance to speak to the Ohio Civil Rights Commission and participate in the investigation was not protected under Title VII as there

was no evidence he was pressured to lie or give information outside his knowledge. *Id.* at *15-16. In *Harris*, the plaintiff refused to testify about her alleged experiences of discrimination. *Harris* at *22. The plaintiff refused to testify about her alleged experiences at a deposition even after a magistrate ordered her to do so. *Id.* at *22. The *Harris* plaintiff also did not cooperate with investigators in a separate internal investigation of her alleged claims. *Id.* Here, there is no dispute that Croley met with Pennington on January 15, 2020, representatives of Frank Road Recycling on January 23, 2020, and Loewendick on January 24, 2020. Croley continually met with the appellees and provided the noose for inspection upon request. The issue in the present case concerns Croley's refusal to turn the noose over to Loewendick or allow the noose to be cut. Because *Thomas* and *Harris* concern a plaintiff's reluctance or refusal to testify as the basis for the noncompliance, we find the present case distinguishable. Thus, under Civ.R. 56 review, the first two prongs are satisfied as the activity was protected and the company knew the activity was protected.

{¶ 67} As to the remaining factors, the third element is satisfied as Croley was subject to an adverse employment action when he was terminated for refusing to turn over the noose. There is also a reasonable dispute of fact whether there is a causal link between the protected activity and the adverse action. Croley initially participated in the investigation, but he refused to allow Loewendick to keep or cut a piece of the noose. As the appellees concede, after Croley refused to allow the noose to be cut, "Loewendick terminated Appellant for insubordination and impeding the investigation into the noose incident." (Appellees' Brief at 7.) "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see also Dautartas v. Abbott Laboratories*, 2012-Ohio-1709, ¶ 52 (10th Dist.) ("close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action may constitute evidence of a causal connection for purposes of satisfying a prima facie case of retaliation"). As such, viewing the evidence most favorable to Croley, we find he has demonstrated a prima facie case of retaliation.

{¶ 68} The trial court alternatively found that even if Croley was engaged in protected activity, he failed to establish the retaliatory animus was the "but for" cause of his termination. (Decision and Entry at 29.) The trial court found that Croley was terminated not because he reported discriminatory conduct, "but because of his insubordination when he prevented [the appellees] from completing their investigation into said report. [The appellees] appreciated the seriousness of [Croley's] allegations regarding discriminatory conduct at the workplace." *Id.* The trial court's conclusion goes awry in several respects. First, there is no dispute that Croley was terminated for not allowing the appellees to keep the noose or cut a piece of it for its investigation. Whether a jury finds this justification legitimate or pretextual, the "but for" cause is not in dispute. The trial court appears to impermissibly adopt the appellees' argument that refusal to turn over the noose was a legitimate ground to terminate Croley. However, under Civ.R. 56 review, we must consider the evidence in favor of Croley. For the reasons set forth previously, Croley has demonstrated a prima facie case of retaliation.

{¶ 69} As a result, the burden shifts to the appellees to offer a legitimate nonretaliatory reason for the termination. *Childs*, 2023-Ohio-2034, at ¶ 109. (10th Dist.). The Sixth Circuit Court of Appeals has held that " ' "an intervening legitimate reason" to take an adverse employment action "dispels an inference of retaliation based on temporal proximity." ' " *Tharp v. Apel Internatl., L.L.C.*, 2022 U.S. App. LEXIS 21050, *10 (6th Cir. July 28, 2022), quoting *Kuhn v. Washtenaw Cty.*, 2013 U.S. App. LEXIS 4799, *628 (6th Cir. Mar. 11, 2013). Courts have found that failure to cooperate with an internal investigation is a frequent and permissible basis for the discharge of an employee. *See, e.g.*, *Wood v. Summit Cty. Fiscal Office*, 377 2010 U.S. App. LEXIS 9999, *518 (6th Cir. May 14, 2010). We find that the appellees have provided a legitimate, nonretaliatory reason for terminating Croley's employment. A reasonable jury could find that failure to turn over the noose, or allow it to be cut, unreasonably impeded the investigation providing a legitimate reason for termination.

{¶ 70} The burden now shifts back to Croley to show that the termination was pretextual. "To demonstrate pretext at the summary judgment stage, [the plaintiff] must show by a preponderance of the evidence either (1) that Defendants' proffered reason for the termination of his employment had no basis in fact, (2) that the proffered reason was

not the true reason, or (3) that it was insufficient to motivate discharge." *Wilbanks v. Ypsilanti Community Schools*, 742 Fed.Appx. 84 (6th Cir. 2018). Summary judgment is improper if the plaintiff provides evidence from which a jury could reasonably reject the employer's explanation for termination. *Hamilton v. Norfolk S. Corp.*, 2024 U.S. Dist. LEXIS 210031, *26 (S.D.Ohio Nov. 19, 2024), citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Croley can demonstrate pretext by introducing evidence that he provided the noose on multiple occasions to further the investigation. Croley had also previously allowed Pennington to take the noose when he left it outside the employee trailer. Loewendick had not collected any samples of rope from around the worksite to compare it with the noose, did not offer to keep the noose in a neutral location, and never called law enforcement to report the incident. (Loewendick Dep. at 26, 30.) A jury could reasonably believe Croley's explanation for not wanting to turn the noose over to the appellees or allow them to cut a portion of the noose. Thus, there is a dispute of fact as to the final prong in analysis.

{¶ 71} As such, the trial court erred by granting the appellees' motion for summary judgment as to the retaliation cause of action.

### C. Race Discrimination

{¶ 72} In the interest of completeness, we note that Croley has failed to assert in his brief that the trial court erred by dismissing its race-discrimination cause of action. "As the appellate court, we will not manufacture an argument for an appellant, and then proceed to address it." *Hartwick v. Martinez*, 2019-Ohio-1286, ¶ 34 (3d Dist.). Because Croley has not alleged any error by the trial court as to the race discrimination claim in his brief, we decline to address the issue.

{¶ 73} Accordingly, Croley's sole assignment of error is sustained.

## VI. CONCLUSION

{¶ 74} For the foregoing reasons, Croley's sole assignment of error is sustained. This matter is remanded to the trial court for further proceedings consistent with this decision.

*Judgment reversed;*
*cause remanded.*

EDELSTEIN, J., concurs.
JAMISON, P.J., dissents.

JAMISON, P.J., dissenting.

{¶ 75} Because plaintiff-appellant, Jhalil Croley, failed to create a genuine issue of material fact that he was subjected to a hostile work environment, I respectfully dissent from the decision of the majority. The single incident of displaying a noose was isolated and not pervasive or severe enough to create a hostile work environment.

{¶ 76} Croley, an African American male, worked for a temporary employment agency, Reliable Staffing, and was sent to Frank Road Recycling Solutions ("Frank Road Recycling") for an interview on Friday, January 10, 2020. Frank Road Recycling is a construction landfill where debris and waste from large projects is hauled in, compacted, and buried in large, excavated holes. Six to eight employees operate heavy equipment in the landfill.

{¶ 77} Croley met with General Manager Ken Pennington, demonstrated his ability to operate an excavator, and was offered a job on the spot. On Monday, January 13, 2020, Croley reported for work, and spent the day operating an excavator. Croley testified in his deposition that the job interview was pleasant, and his first day at work, three days later, was uneventful with no racial incidents.

{¶ 78} When Croley came to work the next day, January 14, 2020, the excavator was inoperable due to mechanical issues, and Croley was directed by Pennington to operate a compactor, a piece of equipment he had not previously operated. Croley first received basic functional training on the compactor by another equipment operator. A supervisor then replaced the operator and provided training on actual operation in the landfill. Croley met both of his trainers for the first time that day. Croley and a trainer were both in the compactor cab during the training, even though the cab was configured for only one person.

{¶ 79} Croley did not notice the noose during his training, but grabbed a rope hanging from the vehicle ceiling for support as the compactor was traversing rough terrain in the landfill. At the time, he had no specific thoughts on the rope and continued training. The supervisor then left the cab and Croley began operating the compactor alone.

{¶ 80} As Croley was operating the compactor, he paid more attention to the rope and discovered it was secured from the cab ceiling with the end tied in the form of a noose. Once he perceived the rope was a noose, he became nervous and scared and took a picture of it. Croley took the noose down and placed it on the floor of the compactor and continued

working.  Croley testified in his deposition that the rope was approximately seven feet long and was clean and appeared to be freshly tied.

{¶ 81} Operators are shuttled from a trailer on the landfill's upper level to the work site.  Croley left the noose in the compactor and did not mention it when he returned to the trailer for lunch.  Croley worked the remainder of the day without informing anyone about the noose and put the noose in his pocket at the end of the day.  Croley went inside the trailer to clock out and threw the noose on the rubble in front of the trailer as he left work that evening.

{¶ 82} That night, Croley talked to his career counselor, and he was advised to contact the employment agency who placed him at the landfill.  Croley reported to work on his third day, January 15, 2020, and notified the employment agency of the noose, who in turn notified Frank Road Recycling.  Pennington met with Croley that morning and informed him that he was starting an investigation.  Croley testified that Pennington seemed concerned about the incident.

{¶ 83} Croley relates that he told Pennington the noose was in the rubble near the trailer, but noticed the noose was still lying there on his lunch break and picked it back up and kept it for safekeeping.  Croley testified in his deposition that when he retrieved the rope, it was now very dirty from lying in the rubble.  The rope was never provided to Frank Road Recycling because Croley did not trust anyone and refused to turn it over.

{¶ 84} On January 21, 2020, Croley was operating an excavator when a window shattered.  Croley did not know what caused the damage but noticed Pennington's vehicle parked on a hill.  Croley attributed the incident to someone shooting a BB or pellet gun and characterized it as an intentional racial incident.  Pennington informed Croley he could continue to work or go home; Croley stayed at work and operated a rock truck for the remainder of the day.

{¶ 85} On January 23, 2020, Joseph Loewendick, an owner of Frank Road Recycling, met with Croley and a representative from the employment agency.  Loewendick was conducting an investigation into the noose incident, and Croley agreed to bring the noose to work the next day.

{¶ 86} On January 24, 2020, two employees informed Pennington that Croley was driving the compactor fast.  Pennington went out and observed Croley driving fast and

warned him to slow down and stay in low gear. About 30 minutes later, Pennington saw Croley driving fast in high gear again and pulled him from the compactor for safety reasons.

{¶ 87} Croley brought the noose to work on that same day, January 24, 2020. He allowed it to be inspected but refused to turn it over to Loewendick. Loewendick then requested to cut a piece of the rope to compare it with other rope, but Croley refused. Loewendick terminated Croley for insubordination and impeding the noose investigation.

{¶ 88} On October 14, 2020, Croley filed an action against Frank Road Recycling, asserting claims of a hostile work environment, racial discrimination, and retaliation. On January 18, 2022, Frank Road Recycling filed a motion for summary judgment on Croley's claims, and on March 1, 2022, Croley filed a response. On August 10, 2023, the trial court granted summary judgment in favor of Frank Road Recycling.

{¶ 89} Croley brings the instant appeal and asserted as his sole assignment of error that the trial court erred when it granted Frank Road Recycling's motion for summary judgment regarding his hostile work environment and retaliation claims.

{¶ 90} A summary judgment decision is reviewed de novo by the appellate court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). The evidence is construed in a light most favorable to the non-movant and no deference is given to the trial court's decision during our review of the record. *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181 (1997).

{¶ 91} The movant has the initial burden under Civ.R. 56(C) of identifying the basis of its motion and identifying any portions of the record that support the absence of a genuine issue of material fact. *Rarden v. Ohio Dept. of Rehab. & Corr.*, 2012-Ohio-5667 (10th Dist.). If the moving party meets its burden, the non-moving party may not rest on the allegations or denials in the pleadings but has a reciprocal burden under Civ.R. 56(E) to produce "specific facts showing that there is a genuine issue for trial." *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). If the non-movant does not offer any Civ.R. 56(E) evidence, "summary judgment, if appropriate, shall be entered against the [non-moving] party." Civ.R. 56(E).

{¶ 92} Civ.R. 56(C) provides an exclusive list of items for a trial court to consider when presented with a motion for summary judgment, including "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence . . ., and

written stipulations of fact." (Quotation marks deleted and citations omitted.) *Martinez v. Yoho's Fast Food Equip.*, 2002-Ohio-6756, ¶ 46 (10th Dist.). Any other evidentiary material must be incorporated by reference in an affidavit pursuant to Civ.R. 56(E). *State ex rel. Anderson v. Obetz*, 2008-Ohio-4064 (10th Dist.). Failure to properly authenticate a photograph or document submitted on summary judgment strips it of any evidentiary value. *Ludwigsen v. Lakeside Plaza, L.L.C.*, 2014-Ohio-5493 (12th Dist.).

{¶ 93} In support of their summary judgment motion, Frank Road Recycling presented the affidavit of Pennington. The affidavit was based on Pennington's personal knowledge, and stated all equipment operators work alone at various locations on the landfill, including hills, and that Croley never indicated he had a problem operating equipment at any location. The affidavit also declared that it was not uncommon for glass in the equipment to break from flying construction debris. Frank Road Recycling also submitted the affidavit of Loewendick, who declared that Frank Road Recycling has a zero tolerance for discrimination and that an investigation had started. Frank Road Recycling also provided Croley's responses to interrogatories and request for production of documents, along with an affidavit from Attorney Christopher R. Green.

{¶ 94} Croley filed a memorandum contra to the motion but did not submit an affidavit nor any evidence required by Civ.R. 56(E). Croley's response cites to depositions of the parties in this matter but only refers to incidents, such as the finding of the noose and the sequence of events that occurred after that, and does not cite to any portion of the record that supports his assertion that a genuine issue of material fact exists.

{¶ 95} Croley attached a photograph of a noose as an exhibit, but it was not properly authenticated. A photograph is not one of the items authorized by Civ.R. 56(C) and requires incorporation by affidavit. Civ.R. 56(E). Documents that have not been authenticated have no evidentiary value and may not be considered by the trial court in deciding whether a genuine issue of material fact remains for trial. *Ocwen Loan Servicing, L.L.C. v. Graf*, 2018-Ohio-2411 (10th Dist.).

{¶ 96} Looking at the evidence in a light most favorable to Croley, I now turn to the merits of Croley's argument that genuine issues of material fact regarding the true reasons for his termination precluded summary judgment in favor of Frank Road Recycling on his racial discrimination claims.

{¶ 97} Under R.C. 4112.02(A), it is an unlawful discriminatory practice for an employer to discriminate against an employee "with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." To establish a claim brought under R.C. 4112 against an employer for a hostile work environment, Croley must establish that (1) he was a member of a protected class, (2) he was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was severe or pervasive and had the purpose or effect of unreasonably interfering with his work performance or creating an intimidating, hostile, or offensive work environment, and (5) respondeat superior liability regarding Frank Road Recycling existed. *Hinkle v. L Brands, Inc. World Headquarters*, 2021-Ohio-4187 (10th Dist.). A hostile work environment is permeated "with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (Quotation marks deleted and citation omitted.) *Natl. RR. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). "The conduct must be both subjectively and objectively severe and pervasive; that is, it must be offensive both to a reasonable person and the actual victim." *Brown v. Dover Corp.*, 2007-Ohio-2128, ¶ 38 (1st Dist.).

{¶ 98} A hostile environment is determined by examining all the circumstances, including the "frequency and severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely an offensive utterance, whether the conduct unreasonably interferes with an employee's work performance and whether psychological harm results." *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 723 (10th Dist. 1999). On summary judgment, the totality of the alleged race-based harassment is examined and not any one factor is dispositive. *Chapa v. Genpak, L.L.C.*, 2014-Ohio-897 (10th Dist.). Federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq.*, is generally applicable to cases involving alleged violations of R.C. Ch. 4112. *Motley v. Ohio Civ. Rights Comm.*, 2008-Ohio-2306 (10th Dist.).

{¶ 99} Croley alleged that he was subject to a hostile work environment. Croley's argument is based on three alleged instances of harassment: the brief display of a noose, the shattering of glass in a construction vehicle by unknown causes, and harassment from supervisors and a constant fear of harm from them.

{¶ 100} "Whether a work environment is a hostile environment is a question of fact." *Peterson* at 724. Other appellate courts have determined that whether "harassment is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact.'" (Further quotation marks deleted and citation omitted.) *Hidy Motors, Inc. v. Sheaffer*, 2009-Ohio-3763, ¶ 21 (2d Dist.), quoting *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996).

{¶ 101} As Croley points out, courts have recognized references to lynching and nooses as racial harassment. *See, e.g., Allen v. Michigan Dept. of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999) ("[E]vidence of racial harassment is the threatening letter . . . contain[ing] a reference to lynching, [and] a drawing of a . . . noose."). The placement of a noose in the workplace can reasonably be perceived as racially hostile conduct. *Bailey v. USF Holland, Inc.*, 526 F.3d 880 (6th Cir. 2008). The question remains, however, whether the conduct in this case was sufficiently severe or pervasive enough to create a hostile work environment.

{¶ 102} The "pervasive" or "severe" standard "sets a high bar for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 485 (6th Cir. 2020). The severe or pervasive requirement does not present two mutually exclusive evidentiary choices, but rather deficiencies in the strength of one factor may be made on the strength in the other. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169 (2000). The "greater severity in the impact of harassing behavior requires a lesser degree of pervasiveness in order to reach a level at which Title VII liability attaches." (Quotation marks deleted and citation omitted.) *Id.* at 181.

{¶ 103} Croley also alleged that someone fired a BB or pellet gun at the excavator he was operating and caused the window to shatter. Croley conceded he has no idea how the window shattered, and does not know who, if anyone, fired a shot. In his deposition, Croley alleges that the glass shattering incident constitutes racial discrimination against him solely because he believes the noose also is racial discrimination. Croley offers no facts, affidavits, or other Civ.R. 56(E) evidence in support of his assertions.

{¶ 104} There must be a clear link or nexus between the glass shattering and prohibited racial conduct by Frank Road Recycling. *Smith v. Superior Prod., L.L.C.*, 2014-

Ohio-1961 (10th Dist.). The only inference is made by Croley, himself. There are no facts in the record that support a claim that the window was shattered by a BB or pellet, or if that is even possible.

{¶ 105} Croley offers only his belief, and not proof, that Pennington shot the window with racist intent, which "does not satisfy [Croley's] burden to set forth specific evidence showing that there is a genuine issue of fact." *Woods v. Capital Univ.*, 2009-Ohio-5672, ¶ 40 (10th Dist.). In responding to a motion for summary judgment, " 'the nonmoving party must do more than supply evidence of a possible inference that a material issue of fact exists; it must produce evidence of specific facts which establish the existence of an issue of material fact.' " *Gibbs v. Columbus Metro. Hous. Auth.*, 2012-Ohio-2271, ¶ 19 (10th Dist.), quoting *Carrier v. Weisheimer Cos., Inc.*, 1996 Ohio App. LEXIS 617, *17 (10th Dist. Feb. 22, 1996).

{¶ 106} Here, there is mere speculation in the absence of actual evidence to show that the glass shattering had any racial connection. *Ohio Bell Tel. Co. v. Columbus*, 2009-Ohio-5126 (10th Dist.). Croley's subjective beliefs, supported solely by self-serving speculative and conclusory testimony, fail to establish that a material fact issue is in dispute. *Kevin O'Brien & Assocs. Co., LPA v. PLS Fin. Solutions of Ohio*, 2024-Ohio-3170 (10th Dist.). Speculative allegations that a person is prejudiced or treated another person poorly because of his race are conclusory statements that are non-competent summary judgment evidence. *Eaton-Stephens v. Grapevine Colleyville Indep. School Dist.*, 715 Fed.Appx. 351, 354 (5th Cir. 2017).

{¶ 107} This court has held that a trier of fact may not make an inference based solely and entirely on another inference, absent additional facts or inferences from other facts to support the second inference. *Bell v. Giamarco*, 50 Ohio App.3d 61, 63 (10th Dist. 1998). Unsupported factual assertions and anecdotal allegations are insufficient to demonstrate a genuine issue of fact. *Dipenti v. Park Towers Condominium Assn.*, 2020-Ohio-4277 (10th Dist.). Inference stacking "will not withstand a motion for summary judgment." *Boyd v. Columbiana Foods, Inc.*, 2022-Ohio-436, ¶ 20 (11th Dist.). An appellate court may not "make inferences from a plaintiff's speculation as to what the facts are." *Ray v. Wal-Mart Stores, Inc.*, 2013-Ohio-2684, ¶ 35 (4th Dist.). Croley may have believed that the window was shattered by a BB or pellet gun, but he offers nothing but improper multiple inferences

for support.  His deposition testimony is clear—he does not have a clue what shattered the window.

{¶ 108} " 'A light most favorable' is a term of art that is susceptible to conjecture and speculation to illuminate the darkness of unknown and unknowable facts, and applying it can therefore transmogrify otherwise innocuous comments and behavior into incriminating evidence." *State v. Shepard*, 2024-Ohio-1815, ¶ 4, (Donnelly, J., dissenting.) There simply is no place for conjecture and speculation in this case.

{¶ 109} Summary judgment questions are resolved on the "basis of the facts in the record, not on the basis of conjecture." *Health Carousel Travel Network, L.L.C. v. Alecto Healthcare Servs. Wheeling, L.L.C.*, 2024-Ohio-4599, ¶ 39 (1st Dist.).  To find in Croley's favor "would require speculation and impermissible stacking of inferences, which is insufficient to create a genuine issue of material fact sufficient to preclude a granting of summary judgment." *Gouhin v. Giant Eagle*, 2008-Ohio-766, ¶ 12 (10th Dist.).

{¶ 110} Croley also alleged that he was subject to harassment by being forced to work on a cliff, being disciplined for speeding, and being the subject of a police report for threatening behavior towards Frank Road Recycling.  Similar to the glass-shattering incident, Croley offered no real basis for this harassment, and the record is devoid of any racial animus.  Croley reported to work on his fourth day, January 16, 2020, and was assigned to operate equipment in what he characterized as a dangerous and isolated area. Croley relates he worked in fear and was never comfortable again at Frank Road Recycling, but he continued to work with no complaint.  It was standard practice for operators to work alone, including on sections with hills.  Croley testified in his deposition that the work on the hills was dangerous but doable, and that he accomplished the task with no problems. Croley alleged the incident was race-based, but did not identify any racial conduct occurring in connection with the work assignment.

{¶ 111} On January 24, 2020, Croley was observed operating a compactor in high gear after being warned, and he was written up for that.  Croley was terminated that same day and was not aware of the discipline until it was shown to him at his deposition.  Later that day, employees reported to Loewendick that Croley had concerning words with them off-site after he was terminated.  Loewendick made a police report regarding the incident

to make a record. Nothing further happened. None of the three incidents remotely supports a finding of a hostile workplace and should be ignored.

{¶ 112} To create a genuine issue of material fact on whether alleged harassment was racially connected, Croley must submit actual evidence to at least allow the jury to form a reasonable inference that Pennington fired a BB or pellet gun at the compactor with a racial character or purpose, and that the alleged harassment by Frank Road Recycling was also race-based. *Hinton v. Ohio Dept. of Youth Servs.*, 2022-Ohio-4783 (10th Dist.). "Supposition, however, does not create a genuine issue of material fact." *Ohio Bell Tel. Co.*, 2009-Ohio-5126, at ¶ 17 (10th Dist.).

{¶ 113} Croley failed to meet his reciprocal burden by pointing to evidence in the record that would make an inference that the glass shattering and other allegations of harassment were race-based and establish the existence of a genuine issue of material fact. *Turner v. Univ. of Cincinnati*, 2020-Ohio-248 (10th Dist.). The third prong of the hostile work environment test is not satisfied by these allegations.

{¶ 114} The record only supports the display of the noose as a basis for a hostile work environment action. To determine whether a hostile work environment exists, the trial court must examine the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance; and the psychological effect of the conduct on the employee. *Camp v. Star Leasing Co.*, 2012-Ohio-3650, ¶ 29 (10th Dist.).

{¶ 115} The premise advanced by Croley is that on Friday, January 10, 2020, Pennington met and hired him fresh out of heavy equipment school to work in a landfill so he could place a noose in Croley's vehicle on Tuesday, January 14, 2020. Croley saw a noose in the compactor and immediately took it down. Frank Road Recycling recognized the significance of the noose, but also noted that it may not be a noose because customers used similar rope in their operations. However, for summary judgment purposes, this factual dispute is resolved in Croley's favor because he reasonably perceived the rope as a noose. *Morgan v. The Kroger Co.*, 2009-Ohio-1553 (10th Dist.).

{¶ 116} Other than the noose, there are no credible allegations of any race-based comments or other activity involving race. The noose is not connected to any threatening

intent or racial animus by Frank Road Recycling. The display of a noose only occurred once, for a very brief time, and Croley was the only person who noticed the noose.

{¶ 117} Isolated incidents of harassment ordinarily do not rise to the level of a hostile workplace and are neither severe nor pervasive enough to cause a hostile work environment. *Goodell v. Williams*, 643 F.3d 490 (6th Cir. 2011). A single incident must be "extraordinarily severe" to create a hostile work environment. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

{¶ 118} The mere presence of a noose in the workplace has generally been found to be insufficient to establish a racially hostile work environment. *Reed v. Procter & Gamble Mfg. Co.*, 556 Fed.Appx. 421, 434, fn. 2 (6th Cir. 2014). The *Reed* court recognized that, under the right circumstances, a single incident can constitute a hostile work environment, but I believe those circumstances are rare. While only a single incident involving a noose may be the basis for a racial discrimination claim, it does not "rise to a level sufficiently severe or pervasive enough to constitute a hostile work environment." *Thomas v. Amtech*, 464 F.Supp.2d 688, 699 (N.D.Ohio 2006).

{¶ 119} There is a distinct paucity of discrimination cases regarding a noose in Ohio courts. An employee was not subject to a hostile work environment when unknown employees posted racially offensive pictures, and a noose was hung at a co-worker's station. *Brown*, 2007-Ohio-2128 (1st Dist.). This court affirmed summary judgment in favor of an employer after an employee who made racial remarks to another employee and hung a noose in his work area was terminated and subsequently filed a discrimination action against the employer. *Morrisette v. DFS Servs., L.L.C.*, 2013-Ohio-4336, ¶ 3 (10th Dist.). Similar to the present situation, the plaintiff was terminated for a legitimate, nondiscriminatory reason. *Id.*

{¶ 120} The *Reed* court ultimately found that a hostile work environment was not established when a team leader crafted a noose and made a hanging gesture while standing behind the plaintiff and the plaintiff was subject to comments about eating fried chicken and watermelon from co-workers. *Reed* at 433. The Sixth Circuit found that while the noose was "troubling" it was isolated and "not sufficiently severe or pervasive" to support a hostile work environment claim. *Id.*

{¶ 121} The Sixth Circuit has addressed this issue with almost uniform results, and "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory," and the display of a noose under the circumstances of this case does not clear that bar. *Phillips v. UAW Internatl.*, 854 F.3d 323, 328 (6th Cir. 2017). An isolated incident of alleged harassment based on race " 'will not amount to discriminatory changes in the "terms and conditions of employment." ' " *Id.* at 327, quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998). Courts recognize that the incident may be offensive and condemnable, but simply not actionable. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20 (1993).

{¶ 122} A single noose was found to be an isolated incident and does not establish a hostile work environment. *Martin v. Am. Midstream Partners, LP*, 386 F.Supp.3d 733 (E.D.La. 2019). *See Brooks v. Firestone Polymers, L.L.C.*, 640 Fed.Appx. 393 (5th Cir. 2016) (a noose anonymously placed in an employee's belongings was an isolated incident and did not establish a hostile work environment); *Carter v. Luminant Power Servs. Co.*, 2011 U.S. Dist. LEXIS 140931 (N.D.Tex. Dec. 6, 2011) (no hostile work environment where plaintiff viewed noose only once and it was not displayed in a manner that was physically threatening to plaintiff). The Fifth Circuit requires "more serious incidents for the display of a noose to amount to a hostile work environment." *Davis v. Ochsner Med. Ctr.*, 2016 U.S. Dist. LEXIS 47174, *10 (E.D.La. Apr. 7, 2016).

{¶ 123} The conduct experienced by Croley was limited to one occurrence, and he has not shown a regular pattern of racist conduct sustained over time. *Bell v. Ingalls Shipbuilding*, 2000 U.S. App. LEXIS 41087 (5th Cir. Jan. 4, 2000) (frequent making of nooses, coupled with the presence of allegedly offensive racial remarks and the presence of KKK graffiti, raise a question of fact regarding the existence of a hostile work environment); *see Jimerson v. Garrett Aviation Servs., L.L.C.*, 2010 U.S. Dist. LEXIS 128440 (S.D.Tex. Dec. 6, 2010) (court found that a rope in the shape of a noose hanging from the rafters at the plaintiff's workplace that a co-worker stated was to wrap around plaintiff's neck, causing the plaintiff to fear for his life, was insufficient to support a hostile work environment claim, as the incident was isolated and not accompanied by physical contact and the plaintiff did not immediately flee or seek help). Incidents of racial harassment must

occur either in concert or with regularity to establish a hostile work environment. *Martinez-Gonzalez v. Lakeshore Staffing, Inc.*, 750 Fed.Appx. 463 (6th Cir. 2018).

{¶ 124} The addition of physical threats enhances the circumstances regarding a noose displayed in the workplace. The Sixth Circuit held that a co-worker holding up a noose to an African American employee's face and telling him, "this is what we do here" was a physical threat. *Rembert v. Swagelok Co.*, 2023 U.S. App. LEXIS 10333, *8 (6th Cir. Apr. 26, 2023) (hostile work environment was established when employees used the N-word constantly and routinely to an African American temporary employee and threatened him with a noose). *See also Brown v. Magna Modular Sys.*, 2014 U.S. Dist. LEXIS 90200 (N.D.Ohio July 2, 2014) (plaintiff made a hostile work environment claim when he saw co-workers make and hang a noose in his workplace, had confrontations with co-workers, and was subjected to the use of the N-word consistently).

{¶ 125} In the *Smith* case cited by Croley in support of a single noose being actionable, plaintiffs reporting for work observed a rope tied into a noose hanging on a wall in the common area of the workplace. *Smith v. Hempstead Dept. of Sanitation Sanit. Dist. No. 2*, 798 F.Supp.2d 443 (E.D.N.Y. 2011). Other employees saw the noose, and a supervisor also saw the noose, but neither removed it nor reported it. *Id.* A plaintiff finally removed the noose and gave it to his supervisor, who in turn passed it on to a superior manager. *Id.* Before the employees left for their routes, the manager called a meeting of all employees, where he made a comment that the hanging of a noose would have been acceptable or funny ten years ago, but not today. *Id.* The workers, including the plaintiffs, completed their assigned duties that day, although the plaintiffs indicated they were upset by both the noose and the manager's comments. *Id.*

{¶ 126} The manager conducted an investigation, and an employee came forth and stated he put the noose on the wall as a joke regarding benefits, but emphasized the noose was only up for no more than five minutes before he threw it into the back of a garbage truck, and that no African American workers had seen the noose. *Id.* The statements insinuated that another employee rehung the noose so plaintiffs could see it. *Id.* The manager had the employee publicly apologize, closed the investigation, and discarded the noose. *Id.* After plaintiffs complained, an official opened a subsequent investigation, but no further action occurred. *Id.*

{¶ 127} Plaintiffs filed a suit alleging a hostile work environment. *Id.* The *Smith* court found that "the public nature of the display, in the central garage, an area where all African American employees would pass that morning, suggests that a reasonable jury could conclude that it was intended as a legitimate threat." *Id.* at 453. The court also found that the manager's comments, that it would have been acceptable in the past, "could be viewed by a jury as a further indication to employees that the [employer] would do little to prevent future, and perhaps more aggressive, racist acts." *Id.* Finally, while the majority is correct that some claims of discrimination were rejected, there was at least some evidence of a "racially-charged atmosphere." *Id.* The totality of the circumstances led the court to find "genuine issues of material fact as to whether a hostile work environment existed for the plaintiffs." *Id.*

{¶ 128} The majority also heavily relies on *Williams*, another New York case, where a supervisor hung a noose on the wall behind his desk in plain view which was seen by two African American plaintiffs and several co-workers. *Williams v. New York City Hous. Auth.*, 154 F.Supp.2d 820 (S.D.N.Y. 2001). When confronted by a plaintiff, the supervisor removed the noose. *Id.* Plaintiffs filed a complaint alleging a hostile work environment.

{¶ 129} *Williams* is not on all fours because it deals with a motion to dismiss, which is only a test of the legal sufficiency of the pleadings and does not address factual sufficiency. *State ex rel. Withers v. State Teachers Retirement Sys. Bd.*, 2017-Ohio-7906 (10th Dist.). In addition, it is further distinguished because a supervisor acknowledged that he hung the noose fully aware of the racist symbolism and only removed it when an employee complained. *Id.* The trial court recognized that had plaintiffs remained silent, the noose "would have been on display indefinitely." *Williams* at 823. There is no such conduct here.

{¶ 130} The *Rosemond* case, where an African American plaintiff discovered a noose hanging over his desk, also is distinguished by several key factors absent in the instant matter. *Rosemond v. Stop & Shop Supermarket Co.*, 456 F.Supp.2d 204 (D.Mass. 2006). Two co-workers admitted they hung the noose, and their supervisor observed the noose but took no action regarding the noose or the employees. *Id.* The employer filed a motion for summary judgment, arguing that the actions were an inappropriate joke, but the court found the act to be tainted by racial animus. *Id.* The trial court found that the employer

was liable for co-worker harassment, and not supervisory harassment, due in part to prior incidents of allegedly racists comments. *Id.*

{¶ 131} The cases cited by the majority all have one thing in common—each one involves additional racial conduct, be it offensive words, inappropriate conduct, or racist graffiti. For example, the majority cites the *Burns* case to support its contention that the noose was directed at Croley, but because the plaintiffs there had been subject to racially hostile comments, racist jokes, multiple uses of the N-word, and a comment by the employee, who hung the noose, that the plaintiff resembled a man being lynched, the facts are inapposite to Croley's sole incident. *Burns v. Berry Global, Inc.*, 2022 U.S. App. LEXIS 3590 (6th Cir. Feb. 7, 2022).

{¶ 132} In *Brown*, an employee put up a noose in the workplace after having words with the plaintiff on two different occasions, in contrast to a single incident by an unknown person. *Brown v. Orange & Rockland Utils., Inc.*, 594 F.Supp.2d 382 (S.D.N.Y. 2009). The court also found additional alleged racial conduct "conclusory and speculative" and insufficient to link the allegations to race. *Id.* at 392.

{¶ 133} The conduct experienced by Croley was not nearly as overt, severe, or egregious as the conduct experienced by employees in the above-cited cases. Although Croley adduced evidence that the noose and other conduct discouraged him from remaining on the job and caused him to experience stress and anxiety, interference with an employee's work performance, is only one factor to be considered. *Hampel*, 89 Ohio St.3d.

{¶ 134} While I clearly understand the ramifications of an employer placing a noose in the workplace, the evidence in this case, viewed under the current analytical framework in place for over 50 years, does not establish an actionable hostile work environment. Considering the totality of the circumstances, I find that Croley has not established that the harassment was sufficiently severe or pervasive enough to alter the conditions of employment and create a hostile work environment. There is no genuine issue of material fact as to whether the brief display of the noose, without any previous or subsequent instances of overtly racial harassment or discrimination, is neither sufficiently severe nor pervasive enough to significantly alter the conditions of Croley's employment and thereby support a cognizable hostile work environment claim. My conclusion does not minimize

the indignities Croley endured; however, the conduct falls short of that required to establish a racially hostile work environment.

{¶ 135} I must note that Croley also failed to establish that Frank Road Recycling failed to take prompt remedial action, which is the last prong of the hostile work environment test. *Hargrette v. RMI Titanium Co.*, 2010-Ohio-406 (11th Dist.).

{¶ 136} Loewendick testified in his deposition that employees searched the landfill looking for similar rope. Loewendick traveled to customers where he talked with their superintendents and looked for similar rope at their locations. Loewendick testified that he cut pieces of rope he found at customers' sites to use for comparison. However, because Croley would not part with the rope, Loewendick was unable to evaluate the rope.

{¶ 137} Frank Road Recycling's inability to locate a similar piece of rope does not render the investigation ineffectual. Croley has failed to carry his burden to produce competent evidence that Frank Road Recycling failed to take prompt remedial action. *Peterson*, 133 Ohio App.3d (10th Dist.).

{¶ 138} Croley next argued that he was wrongfully terminated in retaliation for engaging in protected activity and opposing the destruction of the noose and for complaining about discriminatory treatment. I disagree.

{¶ 139} A plaintiff can prove retaliation either by presenting direct evidence satisfying the elements of a retaliation claim or by providing circumstantial evidence that would support an inference of retaliation. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 331 (6th Cir. 2008).

{¶ 140} Where a plaintiff presents circumstantial evidence of retaliation, the court proceeds under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) (Title VII claims are analyzed under *McDonnell Douglas*.). A plaintiff has the initial burden of establishing a prima facie case of retaliation by proving: " '(1) plaintiff engaged in a protected activity; (2) the employer knew of plaintiff's participation in the protected activity; (3) the employer engaged in retaliatory conduct; and (4) a causal link exists between the protected activity and the adverse action.' " *Motley*, 2008-Ohio-2306, at ¶ 11 (10th Dist.), quoting *Zacchaeus v. Mt. Carmel Health Sys.*, 2002 Ohio App. LEXIS 398, *12 (10th Dist. Feb. 5, 2002).

{¶ 141} Once a prima facie case is established, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas* at 802. If the employer articulates a legitimate nondiscriminatory reason for its actions, the burden shifts back to the employee to show the employer's stated reason was pretext for discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858 (6th Cir. 2003). Pretext can occur by showing the employer's reason: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." (Quotation marks deleted and citation omitted.) *Id*. at 866.

{¶ 142} R.C. 4112.02(I) sets out two types of protected activity. Discrimination is prohibited if a person has opposed any unlawful discriminatory practice, known as the "opposition clause," or has participated in an investigation, hearing, or proceeding under R.C. Ch. 4112, known as the "participation clause." *Veal v. Upreach L.L.C.*, 2011-Ohio-5406, ¶ 18 (10th Dist.). Croley invoked the opposition clause. The opposition clause does not protect all opposition activity. *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304 (6th Cir. 1989).

{¶ 143} Croley claims he was engaging in protected activity when he (1) complained to Pennington on January 14, 2020, (2) complained to management on January 23, 2020, and (3) refused to participate in the investigation and hand the noose over or allow it to be cut. Croley categorizes his actions as reasonable opposition activity, and that his responses were justified under the circumstances of the matter. Croley relates Frank Road Recycling was aware of his complaints and terminated him as a result of engaging in protected activity.

{¶ 144} Once a plaintiff has established a prima facie case of retaliation, the burden shifts to the employer to "articulate a legitimate, non-retaliatory explanation" for the adverse employment action. (Quotation marks deleted and citation omitted.) *Davis v. Omni-Care, Inc.*, 2010 U.S. Dist. LEXIS 53074, *13 (N.D.Ohio June 1, 2010). Frank Road Recycling met that burden by providing evidence that Croley was fired for insubordination, based on his refusal to tender the rope to his employer for inspection. A rational trier of fact could conclude that Frank Road Recycling had a legitimate nondiscriminatory basis for terminating Croley.

{¶ 145} With Frank Road's rebuttal of retaliation, the burden shifted back to Croley to demonstrate, by a preponderance of the evidence, that Frank Road Recycling's proffered reason was pretextual.  *Id.*  "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

{¶ 146} Refusal to participate in an employer's investigation of a discrimination claim is not a protected activity under Title VII, unless the employer applied pressure to an employee to give a false statement or to produce evidence not in his or her possession.  *Merkel v. Scovill, Inc.*, 787 F.2d 174 (6th Cir. 1986) (Title VII protects participation in the investigative process and not generally non-participation).  Refusal to participate in an employer's investigation of discrimination can occur in any number of ways.  In *Merkel*, the Sixth Circuit determined that a plaintiff was not engaging in protected activity when he refused to sign an affidavit and take a polygraph examination relating to an age discrimination investigation.  *Id.*  An employee's claim of retaliation for refusing to talk to the investigator was rejected because participation in the investigation was not a protected activity unless the employer pressured him to give false information to the investigator.  *Thomas v. Norbar, Inc.*, 1987 U.S. App. LEXIS 9533 (6th Cir. July 14, 1987).  The plaintiff's refusal to answer questions in a deposition related to a Title VII investigation was not protected activity because there was no evidence that the employer pressured plaintiff to lie or give information regarding matters about which he had no knowledge.  *Harris v. Fulton-Dekalb Hosp. Auth.*, 255 F.Supp.2d 1347 (N.D.Ga. 2002).

{¶ 147} An employee refused to sign an affidavit regarding a sexual harassment investigation and was properly terminated for failure to participate in the absence of any pressure by the employer to give false statements or provide evidence the employee did not possess.  *Nieves v. Admiral Cooling & Heating, L.L.C.*, 792 N.Y.S.2d 584 (2005).  "An employer does not buy a lawsuit when it attempts to comply with Title VII by investigating a claim of discrimination and dismissing an insubordinate employee who refuses to cooperate in the investigation."  *Harris* at 1356.

{¶ 148} There is nothing in the record that demonstrates Frank Road Recycling pressured Croley to give a false statement or to provide evidence he did not have.  A

"[p]laintiff's failure to cooperate in an internal investigation is not direct evidence of retaliatory discrimination because it requires an inference of or merely suggests retaliatory animus." *Gray v. Deloitte LLP*, 2019 U.S. Dist. LEXIS 238882, *16 (N.D.Ga. Jan. 20, 2019).

{¶ 149} Croley also cites the proximity in time between his protected activity and his termination. Although a close temporal proximity between the employer's knowledge of a protected activity and an adverse employment action may be evidence of retaliation, this court has noted that "proximity alone does not necessarily imply causation." *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, ¶ 41 (10th Dist.). The Sixth Circuit has held that temporal proximity alone is insufficient to establish the causation element. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-364 (6th Cir. 2001) (in the usual case, a plaintiff must show a temporal connection coupled with other indica of retaliatory conduct to prove a causal connection sufficient to find discrimination); *see also Stone v. Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." This case does not involve circumstantial facts from which a jury could infer a causal connection between Croley's delayed reporting of the noose and his termination.

{¶ 150} In this case, Croley was terminated when he refused to provide the noose to Loewendick. There was no pressure to get Croley to lie. The activity was not protected and fails to meet the retaliation standard.

{¶ 151} Frank Road Recycling requested the noose, or at least a piece of it, to conduct testing and to aid in its investigation. The rope is seven feet long, and Croley has made no showing that cutting off a small portion would destroy the rope. Frank Road Recycling sought to examine the rope as part of its investigation, and Croley refused to allow the rope to be examined, stifling the investigation. Thus, the employer had an "intervening legitimate reason" to terminate Croley, and this deflates whatever meaning can be surmised by the short time frame. *Green v. Cent. Ohio Transit Auth.*, 647 Fed.Appx. 555, 560 (6th Cir. 2016). Loewendick testified in his deposition that he terminated Croley because he refused to work with him. Croley only worked at Frank Road Recycling for ten days, so the time period is artificially compressed.

{¶ 152} Croley has failed to establish a prima facie case of retaliation based on his complaints and failure to cooperate with the investigation.  Summary judgment in favor of Frank Road Recycling is proper.

{¶ 153} Upon a review of the evidence viewed most favorably for Croley, there is no genuine issue of material fact that a single incident involving a noose with a very brief, solitaire exposure, while offensive, was not sufficiently severe or pervasive enough to create a hostile work environment.  The record contains factual gaps that can only be cured by speculation and conjecture.  I would affirm.

_____